FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
3:58 pm, Oct 31, 2017
JEFFREY P. COLWELL, CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. ___17-cv-02611_____

[UNDER SEAL],

      Plaintiffs,

v.

[UNDER SEAL],

      Defendants.

---

# COMPLAINT

## FILED IN CAMERA AND UNDER SEAL PURSUANT TO
## 31 U.S.C. § 3730(b)(2)

---

## DOCUMENT TO BE KEPT UNDER SEAL

Daniel M. Twetten
dan@loevy.com
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
Tel: (720) 583-6514
Colorado Bar Number: 44134

Eric Havian
ehavian@constantinecannon.com
Jessica Moore
jmoore@constantinecannon.com
Harry Litman
hlitman@constantinecannon.com
Leah Judge
ljudge@constantinecannon.com
CONSTANTINE CANNON LLP
150 California St., 16th Floor
San Francisco, CA 94111
Tel: (415) 639-4001

Michael Ronickher
mronickher@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave. NW, Suite 1300N
Washington, DC 20004
Tel: (202) 204-3500

Attorneys for [UNDER SEAL]

411502.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

UNITED STATES OF AMERICA, ex rel. DENNIS KOGOD,

      Plaintiffs,

v.

DAVITA, INC.,
DAVITA RX, LLC,
DVA LABORATORY SERVICES, INC., d/b/a DAVITA LABS,
TOTAL RENAL LABORATORIES, INC.,
RMS LIFELINE, INC., d/b/a LIFELINE VASCULAR ACCESS,
REGAL MEDICAL GROUP, INC., and
HERITAGE PROVIDER NETWORK,

      Defendants.

---

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**[31 U.S.C. § 3729 *et seq.*]**

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**JURY TRIAL DEMANDED**

---

*Qui Tam* Plaintiff-Relator Dennis Kogod, through his attorneys, on behalf of the United

States of America (the "Government," or the "Federal Government"), for his Complaint against

Defendants DaVita, Inc.; DaVita Rx, LLC; DVA Laboratory Services, Inc., d/b/a DaVita Labs;

Total Renal Laboratories, Inc.; RMS Lifeline, Inc., d/b/a Lifeline Vascular Access (collectively,

the "DaVita Defendants" or "DaVita"); Regal Medical Group ("Regal"); and Heritage Provider

Network ("Heritage") alleges, based upon personal knowledge, relevant documents, and

information and belief, as follows:

411502.1

I.      **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false or fraudulent records, statements, and claims made and caused to be made by the DaVita Defendants, Regal, and Heritage (collectively, "Defendants") or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"). Defendants have also failed to repay the United States for claims they know or in the exercise of reasonable diligence should know are false, and they have conspired with others to commit violations of the FCA.

2.      This *qui tam* case is brought against Defendants for knowingly defrauding the Federal Government in connection with government-sponsored healthcare programs.

3.      As alleged in greater detail below, from at least 2005 to the present, the DaVita Defendants have engaged in a wide-ranging series of fraudulent schemes related to their provision of dialysis and related services to patients with End-Stage Renal Disease ("ESRD"). The schemes have included:

a)   Paying illegal kickbacks to physicians to cause them to refer patients to the DaVita Defendants for dialysis, laboratory, pharmacy, and other services;

b)   Engaging in a collusive kickback scheme with Fresenius Medical Care, DaVita's primary competitor in the dialysis market, related to referrals to DaVita's pharmacy business—DaVita Rx, LLC—and DaVita's purchase of dialysis supplies from Fresenius;

c)   Paying kickbacks to patients by routinely waiving patient coinsurance and copay amounts regardless of financial need;

411502.1

d)  Billing government-funded healthcare programs for separately billable laboratory services provided without a valid, signed physician prescription;

e)  Billing government-funded healthcare programs for prescription drugs that the patient never picked up—in some cases because the patient was deceased before the prescription was even filled.

4.      DaVita, through its DaVita Medical Group division, and Defendants Heritage and Regal (collectively, the "MA Defendants") also have engaged in a fraudulent scheme with respect to the Medicare Managed Care ("Medicare Advantage") program.  The MA Defendants have paid kickbacks to physicians participating in the Medicare Advantage program to induce those physicians to:

a)  Cause their patients to sign up for Medicare Advantage through the MA Defendants' physician groups, and to enroll in whichever Medicare Advantage Plan gave the MA Defendants the greatest profit; and

b)  Inflate the risk-adjustment diagnosis codes the physicians submitted with respect to care provided to their patients to improperly increase the reimbursement the MA Defendants received from Medicare, via Medicare Advantage plans.

5.      DaVita also has improperly billed government-funded healthcare programs for hospice services provided to patients who were not qualified for the program.  Moreover, when DaVita discovered through audits that improper billing had occurred, DaVita offered to repay the government only a small portion of the amount DaVita knew it had overbilled.

6.      As a result of these actions, Defendants have submitted and caused to be submitted tens or hundreds of thousands of fraudulent claims to government-funded healthcare

411502.1

programs for healthcare services that were not performed as billed or were ineligible for reimbursement because they were tainted by kickbacks or otherwise. Each such submission is a false or fraudulent claim in violation of the FCA. Defendants have also purposefully refused to repay or to fully repay the same healthcare programs for known overbilling. Each inappropriate retention of an ill-gotten gain is a false or fraudulent claim in violation of the FCA.

7.      Had the Government been aware of the falsity of these claims, it would not have made the associated payments and it would have recovered any payments already made based on them.

8.      Through these schemes, Defendants have defrauded the United States of hundreds of millions of dollars.

9.      Defendants' conduct alleged herein violates the FCA. The federal False Claims Act was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud perpetrated against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress has characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

10.      The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the Federal Government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or

411502.1

statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and (d) knowingly conspiring to commit a violation of any of these provisions.  31 U.S.C. §§ 3729(a)(1)(A)-(C), and (G).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation committed on or before November 2, 2015—and currently up to $21,916 for each violation committed after November 2, 2015, increasing with inflation—plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

11.　　For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  The FCA does not require proof that the defendants specifically intended to commit fraud.  *Id.*  Unless otherwise indicated, whenever the words "know," "learn," discover," or similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

12.　　Under the FCA, "material" means "having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

13.　　The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during

5

that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

14.     Based on the foregoing laws, Qui Tam Plaintiff-Relator Dennis Kogod seeks, through this action, to recover on behalf of the United States damages and civil penalties arising from the false or fraudulent records, statements, or claims that the Defendants made or caused to be made in connection with false or fraudulent claims, including fraudulently retained overpayments, to government-funded healthcare programs.

## II.     PARTIES

15.     Relator Dennis Kogod ("Relator") is a resident of Laguna Beach, California.  He is an experienced, senior healthcare executive who began working at DaVita in 2005, when DaVita acquired Gambro Healthcare, Inc.  At the time of the acquisition, Relator was President and Chief Operating Officer of Gambro's West Division.  In his eleven years as an employee at DaVita, Relator served in a series of positions of increasing responsibility, including President of DaVita's Western Division, Chief Operating Officer of DaVita's Kidney Care division, and Chief Operating Officer of DaVita's HealthCare Partners division.  Ultimately, from January 2016 through November 2016, Relator served as President of DaVita's HealthCare Partners division and Chief Executive Officer of International Business.

16.     In November 2016, Relator was relieved of full-time employment and of his primary operational role at DaVita by Chief Executive Officer Kent Thiry, in large part because Relator had raised concerns regarding failures of leadership and compliance.  He continues to work for DaVita as a consultant.

17.     Based on his executive-level position within DaVita, Relator has personal knowledge that it was and continues to be DaVita's pattern and practice to commit the acts

411502.1

alleged herein and submit claims as described below.  He regularly attended board and senior management meetings at which these fraudulent business practices were developed and discussed, and he was privy to high-level conversations about them with the executive team at DaVita.  This access, combined with a close working relationship with CEO Kent Thiry, provided Relator with personal knowledge of the practices alleged herein.

18.     Defendant DaVita, Inc., is a for-profit, publicly-traded Fortune 500 company incorporated in Delaware and headquartered in Denver, Colorado.  The company consists of two major operating divisions: DaVita Kidney Care ("Kidney Care") and DaVita Medical Group ("DMG," formerly known as HealthCare Partners or "HCP").

19.     The Kidney Care division comprises DaVita's U.S. dialysis and related lab services, as well as various subsidiaries such as RMS Lifeline, Inc., d/b/a Lifeline Vascular Access; DaVita Rx; DaVita Clinical Research; and DaVita Nephrology Services.  DaVita's recently established international operations also fall within the Kidney Care division.  DaVita, through its Kidney Care division, is one of the largest kidney care companies in the United States, providing dialysis services for patients suffering from ESRD.

20.     As of December 2016, DaVita Kidney Care provided dialysis and administrative services in the U.S. through a network of 2,350 outpatient dialysis centers in 46 states and the District of Columbia, serving approximately 187,700 patients.  DaVita Kidney Care's dialysis and related lab-care business accounted for approximately 62% of DaVita's consolidated 2016 revenue.

21.     As of December 31, 2016, approximately 88% of DaVita's dialysis patients were covered under some form of government-based program; 75% of its dialysis patients were covered under Medicare or Medicare-assigned plans.

411502.1

22.     DaVita Medical Group is an integrated healthcare delivery and management company.  As of December 31, 2016, DMG served approximately 749,300 members throughout southern California, Colorado, central and south Florida, southern Nevada, Washington, and central New Mexico through capitation contracts with group health plans.  Until approximately 2016, DMG also served members in Arizona and Philadelphia.

23.     Of these members, 305,200 were enrolled in Medicare and Medicare Advantage plans, and the remaining approximately 444,100 were managed care members with health coverage through an employer, through Medicaid, or who otherwise acquired individual health coverage directly from a health plan.

24.     Defendant DaVita Rx, LLC, is a for-profit corporation incorporated in Delaware and headquartered in Coppell, Texas.  It is a wholly owned subsidiary of DaVita.  It specializes in providing oral medications and medication-management services to patients with ESRD and other chronic diseases, as well as providing non-dialysis drugs to a captive dialysis population.

25.     Defendant DVA Laboratory Services, Inc., d/b/a DaVita Labs ("DaVita Labs") is a for-profit corporation incorporated in Florida and headquartered in Denver, Colorado.  It is a wholly owned subsidiary of DaVita.  It is a separately incorporated, licensed clinical laboratory that specializes in ESRD patient testing.  The lab provides routine dialysis tests and other physician-prescribed lab tests for ESRD patients.

26.     Defendant Total Renal Laboratories, Inc., ("Total Renal") is a for-profit corporation incorporated in Florida and headquartered in Deland, Florida.  It is a wholly owned subsidiary of DaVita.  It is a separately incorporated, licensed clinical laboratory that specializes in ESRD patient testing.  The lab provides routine dialysis tests and other physician-prescribed lab tests for ESRD patients.

27.     Defendant RMS Lifeline, Inc., d/b/a Lifeline Vascular Access, ("Lifeline") is a wholly owned DaVita subsidiary that develops and manages vascular access centers across the country for patients with ESRD.  Lifeline enters into these financial arrangements primarily with DaVita Medical Directors and the referring physicians with the largest patient populations.  Vascular access centers provide various procedures, such as angiograms, angioplasty, and vessel mapping.  As of December 31, 2016, Lifeline wholly owned one vascular access clinic and was the majority-owner of nine others.

28.     References herein to "DaVita" denote Defendant DaVita, Inc., and all of its subsidiaries, affiliates, and doing business as aliases, including those subsidiaries named independently as defendants.

29.     Defendant Heritage Provider Network is a for-profit corporation incorporated and headquartered in California.  Through a network of several medical groups, Heritage provides care to almost 500,000 members in the southern and central California regions.  A substantial portion of those members are covered by Medicare Advantage plans.  Medicare Advantage organizations pay Heritage a percentage of the premium they receive from Medicare in exchange for Heritage's provision of care to plan members and coordination of the care provided by non-Heritage providers.

30.     Defendant Regal Medical Group, Inc., is an independent physician association located in Southern California that contracts with Heritage to provide healthcare services to patients enrolled in a variety of health plans, including Medicare Advantage plans.  Regal is one of Heritage's largest affiliated physician groups.

9

411502.1

III.     **JURISDICTION AND VENUE**

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331, 1345, and 1367(a), as well as 31 U.S.C. § 3732, the last of which specifically

confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

32.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public

disclosure of the "allegations or transactions" in this Complaint.  Even if there had been any such

public disclosure, Relator is the original source of the allegations herein because he has direct,

independent, and material knowledge of the information that forms the basis of this Complaint,

and he voluntarily disclosed that information to the Government before filing.

33.     This Court may exercise personal jurisdiction over Defendants pursuant to 31

U.S.C. § 3732(a), as at least one of the Defendants can be found in, resides in, transacts business

in, or has committed acts related to the allegations in this Complaint in the District of Colorado.

34.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), as well as 31

U.S.C. § 3732(a), as at least one of the Defendants can be found in, resides in, or transacts

business in the District of Colorado, and because many of the violations of 31 U.S.C. § 3729

discussed herein occurred within this judicial district.

IV.     **LEGAL BACKGROUND**

   A.     **Federally-Funded Healthcare Programs**

35.     Various federal and state-funded healthcare programs pay for care provided by

Defendants, including Medicare, Medicaid, and other Government-funded healthcare programs.

   1.     **Medicare**

36.     Medicare is a federally funded health insurance program that provides for certain

medical expenses for persons who are over 65, who are disabled, or who suffer from ESRD.  The

10

Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

37.     The Medicare program has four parts: Part A, Part B, Part C, and Part D. Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers hospital services and post-hospital nursing facility care.  Medicare Part B ("Part B"), the Voluntary Supplemental Insurance Plan, covers services performed by physicians or certain other healthcare providers, such as services provided to Medicare patients by physicians, laboratories, and diagnostic testing facilities.  *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s).  Medicare Part C ("Part C") provides for coverage under Medicare's managed care plans.  Medicare Part D ("Part D") provides subsidized prescription drug coverage for Medicare beneficiaries.

38.     Medicare reimburses healthcare providers for the costs of providing covered health services to Medicare beneficiaries.  *See* 42 U.S.C. § 1395x(v)(1)(A).

39.     Medicare pays providers only for services that it considers "reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(1)(A). Medicare regulations exclude from payment services that are not reasonable and necessary.  *See* 42 C.F.R. § 411.15(k).  Providers who wish to participate in the Medicare program must ensure that their services are provided "economically and only when, and to the extent, medically necessary."  42 U.S.C. §1320c-5(a)(1).

### a.     Medicare Fee-for-Service Reimbursement

40.     The traditional Medicare program is administered by private insurance companies that are contracted to act as Medicare Administrative Contractors.  42 U.S.C. §§ 1395h and 1395u.  They serve as agents of the Department of Health and Human Services ("HHS"), making payments on behalf of the program beneficiaries and providing other administrative services.  *Id.*

These companies are called "carriers."  *See* 42 C.F.R. §§ 421.5(c).  Through these carriers, Medicare establishes and publishes the criteria for determining what services are eligible for reimbursement or coverage.  This information is made available to the providers who seek reimbursement from Medicare.

41.     To bill Medicare Part A, a provider must submit an electronic or hard-copy claim form called the UB-04 (also known as the CMS 1450) to the appropriate Medicare carrier.  To bill Medicare Part B, a provider must submit an electronic or hard-copy CMS-1500 form to the appropriate Medicare carrier.

42.     These forms describe, among other things, the provider, the patient, the referring physician, the service(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged.  The provider certifies on the CMS-1500 claim form that the information provided is truthful and that the services billed on the form were "medically indicated and necessary."  The provider certifies in the UB-04 that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate, and complete."

43.     In addition, as part of enrollment and at every periodic re-evaluation, each Medicare provider must sign a provider agreement attesting that they agree to comply with all Medicare requirements including the fraud and abuse provisions.  A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

44.     At all times relevant to this action, the carriers that reviewed and approved the claims at issue in this case based their review upon the enrollment information and claim

411502.1

information provided by the Defendants, and relied on the veracity of that information in determining whether to pay the claims submitted by Defendants.

> **b.**    **The Medicare Advantage Program and Risk Adjustment Payments**

45.    Traditional Medicare operates on a fee-for-service basis, meaning that Medicare directly pays hospitals, physicians, and other healthcare providers for each service they provide to a Medicare beneficiary.

46.    In 1997, Congress created Medicare Part C, which provides similar benefits to Medicare members, but does so based on a managed care model, rather than the traditional fee-for-service model.  Under Part C, rather than pay providers directly, Medicare pays organizations that operate private managed care plans (later named "Medicare Advantage" or "MA" plans) a capitation rate (*i.e.,* a rate paid per member per month).  Those plans are then responsible for covering the costs of paying providers for the services provided to members of that specific Medicare Advantage plan.

47.    In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, creating Medicare Part D, which provides prescription drug coverage. Although a limited number of Medicare Part D plans are operated under a cost-reimbursement contract, the plans are generally financed under a managed care model.  These managed care model plans are provided under both Part D prescription drug plans, which offer only prescription drug coverage, and Part C plans, which integrate the prescription drug coverage with the Part C healthcare coverage.

48.    This Complaint refers, collectively, to (1) Medicare Advantage plans with Part D coverage, (2) Medicare Advantage plans without Part D coverage, (3) stand-alone managed care

Medicare Part D Plans, and (4) the entities that offer and administer those plans, known as Medicare Advantage organizations, as "Medicare Advantage Plans."

49.     CMS pays Medicare Advantage Plans a monthly capitation rate that reflects, among other things, each member's health status.  The process of adjusting the capitation rate to reflect a member's disease states is known as risk adjustment.  Risk adjustment is intended to improve the accuracy of the payments CMS makes to these plans.  To this end, CMS pays a higher rate for enrollees whom the Medicare Advantage Plan represents were treated for certain diseases and conditions in the previous year, based on the expectation that those enrollees will require treatment or management for the conditions in the year for which the Medicare Advantage Plan is being paid (known as the payment year).  *See* 2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide ("*Participant Guide*"), at § 6.4.1 (for purposes of this Complaint, "treatment" is defined as treatment and management within the meaning of the *Participant Guide*).

50.     Conversely, CMS pays a lower rate for enrollees who, although they may have certain typically expensive conditions, did not require care, treatment, or management for those conditions in the prior year.  For these members, the risk adjustment methodology assumes that because their condition did not require treatment in the prior year, it has improved or otherwise changed so that it is not expected to require treatment in the payment year.

51.     The CMS risk adjustment model evaluates enrollee health (and establishes risk-adjustment payment rates) using diagnosis classifications set forth in the International Classification of Diseases, Clinical Modification ("ICD") system.  Prior to October 2015, CMS used the 9th Edition of the ICD system—referred to as the ICD-9 system.  Since October 2015, CMS has used the 10th Edition—ICD-10.

411502.1

52.     The ICD system assigns each diagnosis a specific code, which is "used to describe the clinical reason for a patient's treatment." *Participant Guide* at § 6.2.  Under the MA model, these individual diagnosis codes are organized into disease groups, called Hierarchical Condition Categories ("HCCs").  Medicare Managed Care Manual ("MMCM"), ch. 8, § 50.  Every HCC consists of several ICD diagnosis codes that are clinically related and are expected to require a similar level of resources to treat.  *Id*.  Seemingly similar diagnoses may fall into different HCCs when they are expected to require significantly different levels of treatment.

53.     CMS uses the same general model for the Part D portion of risk adjustment, but it created a distinct list of Hierarchical Condition Categories (here known as "RxHCCs"), reflecting the fact that different conditions may trigger higher costs under Part D.  *See Participant Guide* at § 8.2.5.2.

54.     Under Part C's risk-adjustment payment feature, Medicare pays a Medicare Advantage Plan an average of approximately $3,000 extra for each additional HCC code assigned to a Medicare Advantage member for a year—although that number varies widely depending on which specific HCC is claimed.  Under Part D, Medicare pays an average of several hundred dollars more for each RxHCC per member per year.

55.     Under both Parts C and D, a Medicare Advantage plan may only submit a risk adjustment claim for a diagnosis that has been properly coded per ICD standards.  *See* 42 C.F.R. § 422.310(d)(1) (risk adjustment data must conform to national standards); *see also Participant Guide* at § 7.1.5 (diagnoses must be "[c]oded in accordance with the ICD-9-CM Guidelines for Coding and Reporting").

411502.1

56.     In addition, a risk adjustment claim may only be submitted if the diagnosis meets four additional requirements.  First, the diagnosis must have been *treated or affected treatment* provided to the patient during the visit at issue.  *See Participant Guide* at § 6.4.1; pp. 7-13, 7-14.

57.     Second, the diagnosis must have been treated (or affected treatment provided) during a *face-to-face visit* between the provider and the patient (unless the provider is a pathologist).  *See Participant Guide* at § 7.1.4.

58.     Third, the provider rendering the service must be of a *qualified provider type or specialty*.  *See Participant Guide* at §§ 2.2.1, 3.1.4, 3.2, 4.3, 4.7, 4.11.  CMS has enumerated the physician specialties that are an acceptable source of diagnoses for risk adjustment purposes. *See id.* at § 3.2.3.  Certain non-physician professionals also are acceptable provider types for risk adjustment, including physical therapists, occupational therapists, and physician assistants.  *Id.* at § 3.2.3.

59.     Fourth, the service used as the basis for the risk adjustment claim must have *occurred during the calendar year preceding the payment year.  See Participant Guide* at §§ 2.2.1, 6.4.1, 7.2.4.1; p. 7-11.

60.     CMS also has offered specific additional guidance regarding certain practices or diagnoses known to be at particular risk of abuse, such as having a history of a certain condition, unconfirmed diagnoses, or "problem lists" that track diagnoses a patient has had in the past or that the treating provider believes the patient may have.  *Participant Guide* at §§ 6.4.2, 6.4.3, 6-8, 7.2.4.1.

61.     Medicare Advantage Plans must ensure the validity of the diagnoses and claims they submit.  They are responsible for the content of their risk adjustment claims submissions to CMS, regardless of whether they submit the data themselves or through an intermediary.

411502.1

*Participant Guide* at § 4.1.  Before submitting data to CMS, Medicare Advantage Plans must filter the data "to ensure that they submit data from only appropriate data sources."  *Id.* at § 4.11. For example, Medicare Advantage Plans must confirm that physician data comes from face-to-face encounters with members and ensure that data does not come from non-covered providers, such as diagnostic radiology services.  *Id.*

62.     Medicare Advantage Plans also are required to correct the risk adjustment data they submit to CMS.  When a Medicare Advantage Plan learns that information in a risk adjustment claim (*i.e.*, HIC number, diagnosis code, service dates, or provider type) is invalid or non-compliant with CMS rules, it must submit a "delete record" to CMS for that claim. *Participant Guide* at § 4.13.  Deletion of invalid diagnoses allows CMS to recalculate the beneficiaries' risk scores and ensure that the Medicare Program does not make improper risk adjustment payments to Medicare Advantage Plans and that the Program recovers any improper payments that were already made.

63.     CMS requires Medicare Advantage Plans to submit attestations, each signed by the CEO or CFO (or their authorized, direct subordinate), certifying the accuracy, completeness, and truthfulness of their risk adjustment submissions.  *Participant Guide* at § 4.1.  These attestations are not only required to be eligible to submit risk adjustment data, but they serve as the annual request for payment by the Medicare Advantage Plans for capitation payments from CMS.  42 C.F.R. § 422.504(l).

64.     A new Medicare Advantage Plan (and any third-party submitters) must sign an Electronic Data Interchange ("EDI") Agreement prior to submitting risk adjustment data to CMS.  *Participant Guide* at § 4.1.  The EDI Agreement is a "contract between the MA organization and CMS attesting to the accuracy of the data submitted."  *Id.*  The Medicare

17

Advantage Plan attests on the Form "[b]ased on best knowledge, information, and belief," that it will submit risk adjustment data that are accurate, complete, and truthful.

65.     Additionally, the Medicare Advantage Plan must attest annually that the risk adjustment data it submits to CMS is "accurate, complete, and truthful."  42 C.F.R. § 422.504(l)(1).  The attestation by the Plan acknowledges that risk adjustment information "directly affects the calculation of CMS payments . . . and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution." Form Attestation of Risk Adjustment Data Information Relating to CMS Payment to a Medicare Advantage Organization.  The regulations also provide that if the claims data are generated by a "related entity, contractor, or subcontractor of an MA organization," that entity must similarly certify the "accuracy, completeness, and truthfulness of the data."  42 C.F.R. § 422.504(l)(3).

66.     The requirement that MA organizations submit accurate and truthful data to CMS and correct known errors in their submissions is crucial to their contract with CMS for payment because CMS does not, in the ordinary course, receive the medical records on which diagnoses are based.  CMS therefore cannot tell from risk adjustment data alone whether a particular provider-reported diagnosis is properly supported.  The submission to CMS of data that is false or inaccurate—because it reports diagnoses that are not supported by medical records—directly and necessarily causes CMS to make risk-adjustment payments it would not have made but for the submission of that false or inaccurate data.  Similarly, the submission of "deletions" of previously-provided data that is false or inaccurate directly and necessarily causes CMS either to avoid paying for previously-submitted false or inaccurate diagnoses or to recover payments it made for those false or inaccurate diagnoses.  As a result, an MA organization's failure to submit "deletions" relating to diagnoses that it knows or discovers to be false or inaccurate directly

411502.1

results in that MA organization's retention of overpayments that CMS otherwise would recover. Thus, both the submission of false or inaccurate diagnosis data and the failure to submit corrections to such false or inaccurate diagnosis data influence or are capable of influencing CMS's payment decisions, including CMS's decisions concerning the payment amounts.

67.     Medicare Advantage plans have an obligation to acquire knowledge, information, and belief about their risk adjustment data, including diagnoses, in order to both submit such data and attest to the accuracy and truthfulness of the data.  Nearly 17 years ago, CMS put Medicare Advantage plans on notice that they were "responsible for making *good faith efforts* to certify the accuracy, completeness, and truthfulness of the encounter [*i.e.,* risk adjustment] data submitted" for payments from the Medicare Program.  65 Fed. Reg. 40170 at 40268 (June 29, 2000) (emphasis added); *see also* Medicare Managed Care Manual, Chapter 7, at § 111.7 (February 2004).  When they fail to act in good faith and turn a blind eye to their submission of inaccurate or untruthful data, their Risk Adjustment Attestations are false.

68.     Although an MA organization "maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS," 42 C.F.R. § 422.504(i)(1), entities to which an MA organization has delegated risk adjustment responsibilities must also "comply with all applicable Medicare laws, regulations, and CMS instructions," *id.* at § 422.504(i)(4)(v).

## 2.     Medicaid

69.     Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients.  Funding for Medicaid is shared between the Federal Government and those states participating in the program.

411502.1

70.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS.  Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the items and services for which the Federal Government will pay through its funding of state Medicaid programs.

71.     Each provider that participates in the Medicaid program must sign a provider agreement with his or her state certifying that he or she will submit only claims for services that are medically necessary and for compensation to which the provider is legally entitled.

### 3.     Other Government-Funded Healthcare Programs

72.     The Federal Government administers other healthcare programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, federal workers' compensation programs, and the Federal Employees Health Benefits Program.

73.     TRICARE/CHAMPUS, administered by the U.S. Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces.  10 U.S.C. § 1071 *et seq.*; 32 C.F.R. § 199.4(a).

74.     CHAMPVA, administered by the U.S. Department of Veterans Affairs, is a healthcare program for the families of veterans with 100 percent service-connected disability.  38 U.S.C. § 1781 *et seq.*; 38 C.F.R. § 17.270(a).

75.     The Federal Employees' Compensation Act provides workers' compensation coverage, including coverage of medical care received as a result of a workplace injury, to federal and postal employees.  The Act is administered by the Department of Labor, Division of Federal Employees' Compensation.  5 U.S.C. § 8101 *et seq.*; 20 C.F.R. § 10.0 *et seq.*

20

76.     The Federal Employees Health Benefits (FEHB) Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and their survivors.  5 U.S.C. § 8901 *et seq.*; 5 C.F.R. § 890 *et seq.*

**B.     Federal Coverage of Treatment for ESRD**

77.     Chronic kidney disease is a progressive ailment that ultimately destroys the kidney's ability to process and clean blood.  The loss of kidney function is normally irreversible. ESRD is the stage of advanced kidney impairment that requires continued dialysis treatments or a kidney transplant to sustain life.  Dialysis is the removal of toxins, fluids, and salt from the blood of ESRD patients by artificial means.  Patients suffering from ESRD generally require dialysis at least three times per week for the rest of their lives.

78.     Except in limited circumstances, Medicare provides benefits for patients with ESRD under Medicare Parts A and B.  Individuals otherwise ineligible for Medicare become eligible when they develop ESRD.

79.     Since 1972, the Federal Government has provided universal payment coverage for dialysis treatments under the Medicare ESRD program regardless of age or financial circumstances.  Under this system, Congress establishes Medicare rates for dialysis treatments, related supplies, lab tests, and medications.  Other government-funded healthcare programs and private insurance plans also routinely provide coverage for dialysis, either separately or in combination with a patient's Medicare coverage.

80.     Under the current ESRD Prospective Payment System (PPS), Medicare pays 80% of the CMS-determined amount for each covered dialysis treatment, and the patient is responsible for the remaining 20%.  In most cases, a secondary payor—such as Medicare

supplemental insurance, a state Medicaid program, or a commercial health plan—covers all or part of the 20% balance.

81.     For patients with Medicare coverage, all ESRD PPS payments for dialysis treatments are made under a single bundled payment rate that provides a fixed payment encompassing all goods and services provided during the dialysis treatment.  The bundled payment rate is adjusted based on certain patient characteristics, geographic area, and certain other factors.

82.     Over time, the bundled payment amounts are adjusted to reflect the aggregate cost of the services provided in the bundle.  Thus, if the cost of the dialysate, equipment supplies, and other components of the bundle changes, CMS adjusts the bundled rate for subsequent years.

83.     As of January 1, 2011, all drugs and biologicals, including Epogen, vitamin D analogs, and iron supplements used for the treatment of ESRD are included in the ESRD bundled payment.  42 U.S.C. § 1395rr.

84.     Drugs and biologicals furnished to ESRD beneficiaries that are not used for the treatment of ESRD, however, may be paid separately by Medicare on a fee-for-service basis.

85.     Similarly, as of January 1, 2011, all laboratory services furnished to individuals for the treatment of ESRD are included in the ESRD bundled payment.

86.     Laboratory tests ordered for reasons other than for the treatment of ESRD, however, may be paid separately on a fee-for-service basis.  In such cases, the provider may bill on a Medicare utilizing modifier AY, which serves as an attestation that the item or service is medically necessary for the patient but is not being used for the treatment of ESRD.

87.     Additionally, to be separately payable under the AY modifier, all diagnostic laboratory tests must be "ordered by the physician who is treating the beneficiary," *i.e.*, "the

physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."  42 C.F.R. § 410.32(a).

88. To bill laboratory services to Medicare under the AY modifier, the provider must obtain the treating physician's signed order (or a signed progress note that supports the physician's intent to order) and documentation to support the medical necessity of the ordered service.  *See* CMS Publication ICN 909221, "Complying with Documentation Requirements for Laboratory Services" (April 2015).  Without proper documentation, the claims are considered improper by CMS and, if the Government is aware of the missing documentation, will not be paid, or they will be clawed back if already made.

## C.    Federal Coverage of Treatment for Hospice Care

89. Medicare will pay for what is known as "hospice care" for eligible Medicare recipients.  To be eligible for hospice care paid by Medicare, an individual must be "terminally ill," meaning that "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."  42 C.F.R. § 418.3.

90. Once admitted to hospice care, a Medicare recipient is no longer eligible for services that would help to cure his or her illness.  Instead, the individual receives palliative care, which focuses on relieving the pain, symptoms, or stress of terminal illness and includes a comprehensive set of medical, social, psychological, emotional, and spiritual services.

91. Hospice is available to individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, provided the individual's terminal condition is certified in writing by a physician at the beginning of each period.

411502.1

92.     To qualify for the initial 90-day period, the patient's eligibility for hospice care must be certified by: (a) the Medical Director of the hospice or physician-member of the hospice inter-disciplinary group; and (b) the individual's attending physician, if the individual has an attending physician.  For subsequent periods, certification requires only one of the aforementioned physicians.  42 C.F.R. § 418.22.

93.     The written certification must provide: (1) a statement that the patient's life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; (3) the signature(s) of the physician(s); (4) the physician's brief narrative explanation of the clinical findings supporting a life expectancy of six months or less; and (5) evidence of a face-to-face encounter with the patient.  42 C.F.R. § 418.22; Medicare Benefit Policy Manual ("MBPM"), Chapter 9, § 20.1.

94.     Hospices are paid a per diem rate by Medicare based on the number of days and level of care provided during the election period.  42 C.F.R. § 418.302; MBPM, Chapter 9, § 40. To be covered, hospice services must meet all of the following requirements:

> They must be reasonable and necessary for the palliation and management of the terminal illness as well as related conditions.  The individual must elect hospice care in accordance with § 418.24.  A plan of care must be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56.  That plan of care must be established before hospice care is provided.  The services provided must be consistent with the plan of care.  A certification that the individual is terminally ill must be completed as set forth in § 418.22.

42 C.F.R. § 418.200.

95.     Under the relevant regulations, it is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information."

411502.1

42 C.F.R. § 418.104.  All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated…"  42 C.F.R. § 418.104(b).

96.     Hospice medical records must include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms."  42 C.F.R. §§ 418.22(b)(2), (3).

### D.     Federal Coverage of Outpatient Prescription Drugs

97.     Medicare primarily pays for outpatient prescription drugs through the Medicare Part D program, but a limited number of drugs are also covered through the Medicare Part B program.

98.     Pharmacies that submit claims to Medicare for outpatient drugs (whether directly or through Part D prescription drug plans) must certify their compliance "with all applicable Federal laws, regulations, and CMS instructions"—including the federal Anti-Kickback Statute and Stark Law described below.  *See, e.g.*, 42 C.F.R. § 423.505(i)(3)(iv).   The regulation further requires that they certify "(based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment."  42 C.F.R. § 423.505(k)(1).  This certification is required because the pharmacies do not submit to CMS the medical records that support claimed payments.

99.     Medicare rules also require pharmacies to refund any payments from Medicare for erroneously dispensed prescriptions, including any time when pharmaceuticals are ordered for a patient who does not pick them up.  *See* CMS Prescription Drug Event Guidance for Post Point-of-Sale Claim Adjustments (July 3, 2013) (requiring Part D payors to recoup the cost of an

erroneously dispensed drug from the dispensing pharmacy and to adjust the claim for payment from CMS accordingly).

### E. Ambulatory Surgical Centers

100.    Ambulatory Surgical Centers ("ASCs") are healthcare facilities where patients may undergo surgeries and procedures outside of a hospital or emergency room setting.  They are regulated by both federal and state laws.  Part 416 of Title 42 of the Code of Federal Regulations contains the federal regulations governing ASCs.

101.    ASCs began forming in the 1970s, as patients, physicians, and health insurers increasingly struggled with scheduling problems, lack of adequate equipment, other constrictions on control over their practices, and the soaring costs for procedures performed in hospitals.

102.    Over time, the number of ASCs has skyrocketed.  As recognized by the HHS OIG, ASCs can be more cost effective for surgeries than hospitals, and patients may prefer settings that are less intense than a hospital.  OIG has explained:

> Our regulatory treatment of ASCs recognizes the [HHS] Department's historical policy of promoting greater utilization of ASCs because of the substantial cost savings to Federal health care programs when procedures are performed in ASCs rather than in more costly hospital inpatient or outpatient facilities. . . . Safe harbor protection for ASCs derives in large measure from this longstanding policy encouraging freestanding ASCs as a less costly alternative to hospitals for appropriate surgeries.

64 Fed. Reg. 63, 518, 63, 537 (Nov. 19, 1999).

103.     Thus, ASCs can benefit both government healthcare programs and patients.  *See, e.g.*, OIG Advisory Opinion 98-12 (September 16, 1998) at 3.

104.    ASCs also provide a way for physicians who own and perform procedures in them to increase their profits.  Procedures performed at hospitals generate certain hospital fees (*e.g.*, technical or facility fees) to which the surgeon, who typically receives only the professional

fee, would not be entitled.  ASC facility services (*e.g.*, nursing, technician, use of facility, administrative, materials, etc.), and ancillary items and services integral to surgical procedures trigger CMS payments that are additional to physicians' services fees.  If the surgeon has an ownership interest in the ASC, that surgeon recoups revenue from both his/her own professional fee along with the facility fee or technical fee that otherwise would have been paid to a hospital.

105.    Medicare reimburses providers for procedures at ASCs properly enrolled pursuant to the CMS-855B Medicare Enrollment Application.  In completing that application, ASCs expressly certify that they "agree to abide by the Medicare laws, regulations and program instructions" and certify that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute . . .)."

### F.    Federal Anti-Kickback Statute and Stark Law

106.    Congress has repeatedly taken action to combat kickbacks and other financial inducements in the healthcare decision-making process.  The enactment of these various provisions and amendments demonstrates Congress's commitment to the fundamental principle that federal healthcare programs will not tolerate the payment of kickbacks.

107.    Two key laws addressing this problem are the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law, 42 U.S.C. § 1395nn.  Both prohibit, in broad strokes, payments to healthcare providers or others in exchange for their directing how and where patients receive healthcare services.  Compliance with the Stark Law and Anti-Kickback Statute is a prerequisite to a provider's right to receive or retain payments from Medicare, Medicaid, and

411502.1

other federal healthcare programs.  42 C.F.R. § 422.504(h)(1); 42 U.S.C. §§ 1320a-7b(g), 1395nn(g)(1), 1396b(s).

### 1.        The Anti-Kickback Statute

108.    The Medicare and Medicaid Fraud and Abuse Statute, known commonly and herein as the "Anti-Kickback Statute," 42 U.S.C. § 1320a-7b(b) ("AKS"), was enacted under the Social Security Act in 1977.  The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal healthcare programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

109.    The Anti-Kickback Statute prohibits any person or entity from making or accepting "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" to induce or reward any person for referring, recommending, or arranging for the purchase of any item or service for which payment may be made under a federally-funded healthcare program.  42 U.S.C. § 1320a-7b(b).

110.    The Anti-Kickback Statute is quite broad in terms of the range of people affected, what constitutes a prohibited kickback, and the manner in which the kickback is connected to the Federally-funded medical service.  The statute prohibits any person or entity from offering, paying, soliciting, or receiving any remuneration in exchange for referring, recommending or arranging for a patient to receive federally-funded healthcare services, including services provided under the Medicare and Medicaid programs.  *See id.*

411502.1

111.     Remuneration prohibited by the Anti-Kickback Statute includes "the transfer of anything of value."  OIG Advisory Opinion No. 12-13 (Nov. 5, 2013).

112.     The Anti-Kickback Statute contains statutory safe harbors that exempt certain transactions, such as contracts for employment or personal services, from its prohibitions.  A key theme that runs through these safe harbors is that payments to those in a position to make a referral must be established in advance and in writing, and any payments must be for fair market value—and exclude the value of any referrals for services that would be paid for by Medicare or Medicaid.

113.     Even if the majority of an employee's compensation is for the provision of legitimate professional covered services, to the extent that any portion of the payments made to an employee compensates that employee for making referrals of patients to a hospital or other provider, no safe harbor applies, and the Anti-Kickback Statute is violated.

114.     Thus, for example, one type of financial arrangement about which HHS OIG specifically has expressed concern is the purchase of a physician practice by an entity that receives or is in a position to receive referrals from that practice.  In a December 22, 1992, Opinion Letter, the HHS OIG cautioned that the purchase of a physician practice by a provider, "as a means to retain existing referrals or to attract new referrals . . . implicate[s] the anti-kickback statute because the remuneration paid for the practice can constitute illegal remuneration to induce the referral of business reimbursed by the Medicare or Medicaid programs."  OIG Opinion Letter (Dec. 22, 1992).

115.     The letter further advised that, in order to determine whether the price paid for a physician practice included an illegal kickback:  "it is necessary to scrutinize the payments (including the surrounding facts and circumstances) to determine the purpose for which they

411502.1

have been made.  As part of this undertaking, it is necessary to consider the amounts paid for the practice . . . to determine whether they reasonably reflect the *fair market value* of the practice . . . in order to determine whether such items in reality constitute remuneration for referrals."  *Id.* (emphasis in original).

116.    Moreover, the letter cautioned, "[w]hen considering the question of fair market value, we would note that the traditional or common methods of economic valuation do not comport with the prescriptions of the anti-kickback statute.  Items ordinarily considered in determining the fair market value may be expressly barred by the anti-kickback statute's prohibition against payment for referrals."  *Id.*  It further noted that, "when attempting to assess the fair market value . . . attributable to a physician's practice, it may be necessary to exclude from consideration any amounts which reflect, facilitate or otherwise relate to the continuing treatment of the former practice's patients. . . . Thus, any amount paid in excess of the fair market value of the hard assets of the physician practice would be open to question."  *Id.*  The HHS OIG noted specific items that would "raise a question as to whether payment was being made for the value of the referral stream," including, notably, "payment for goodwill" and "payment for covenants not to compete."  *Id.*

117.    CMS also has specifically recognized the risk that joint ventures between "those in a position to refer business, such as physicians, and those providing items or services for which Medicare and Medicaid pays," might run afoul of the Anti-Kickback Statute.  U.S. Dep't of Health & Human Servs., Office of the Inspector Gen., Special Fraud Alert (Dec. 19, 1994).  Such joint ventures "may be intended not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for these referrals."  *Id.*  Hallmarks of such suspect joint ventures include

411502.1

choosing physician investors "because they are in a position to make referrals" and offering "physicians who are expected to make a large number of referrals greater investment opportunity in the joint venture than those anticipated to make fewer referrals." *Id.*

118.    The Anti-Kickback Statute applies not only to payments to providers in a position to refer business, but to patients themselves.  For example, when a government healthcare program such as Medicare or Medicaid requires a patient to make a co-payment for a service, routine waiver of that co-payment by a provider, without consideration of a patient's ability to pay, may operate as an illegal inducement under the Anti-Kickback Statute.  *See* U.S. Dep't of Health & Human Servs., Office of the Inspector Gen., Special Fraud Alert (Dec. 19, 1994) (stating that co-payment waivers "must not be used routinely; [they] should be used occasionally to address the special financial needs of a particular patient").

119.    As explained by the OIG, "[r]outine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare."  U.S. Dep't of Health & Human Servs., Office of the Inspector Gen., Special Fraud Alert (Dec. 19, 1994).

120.    The prohibition on payment of kickbacks is material to the United States. Medicare and other federal health programs will not pay claims if they are aware that they are tainted by kickbacks.

121.    Compliance with the Anti-Kickback Statute is a precondition to participation as a healthcare provider under the Medicare and Medicaid programs.  42 C.F.R. § 422.504(h)(1). Accordingly, either pursuant to provider agreements or claim forms, or in some other appropriate manner, hospitals, physicians, pharmacies, and others who participate in federal healthcare

411502.1

programs generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.  *Id.*

122.    Moreover, claims for reimbursement for services that are tainted by kickbacks constitute false claims under the False Claims Act.  42 U.S.C. § 1320a-7b(g).

123.    Any party convicted under the Anti-Kickback Statute must be excluded (*i.e.*, not allowed to bill for services rendered) from federal healthcare programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal healthcare programs for a discretionary period (in which event the Secretary must direct the relevant state agencies to exclude that provider from the state health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

124.    The Anti-Kickback Statute has been on the books and well known to healthcare providers since 1972; it has also been strengthened by Congress on multiple occasions.  In 1977, Congress passed the Medicare-Medicaid Anti-Fraud and Abuse Amendments, making AKS violations a felony.  P.L. 95-142, 91 Stat. 1175 (Oct. 25, 1977), codified as 42 U.S.C. § 1320a-7b.  As a House Report stated:  "In whatever form it is found, fraud in these health care financing program[s] … cheat[] taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program.  It diverts from those most in need, the nation's elderly and poor. . . . The wasting of program funds through fraud also further erodes the financial stability of those state and local governments whose budgets are already overextended . . . " H. Rep. 95-393, 95th Cong., 1st Sess. at 44, reprinted in 1977 U.S.C.C.A.N. 3039, 3047. The Medicare and Medicaid Protection Act of 1987 mandated exclusions for those convicted of

program-related kickbacks and broadened the Secretary's authority to exclude providers from the program for fraud, kickbacks, and other abuses.  S. Rep. 100-109, 100th Cong., 1st Sess. at 1-2, reprinted in 1987 U.S.C.C.A.N. 682, 682-683.

125.     Through the AKS, the government expressly discourages the potential corrupting effect that payments for referrals might have on patient-care decisions.  The law provides that "a claim that induces items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]," a provision intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act[.]" 155 Cong. Rec. S10854.

126.     Noncompliance with the AKS by Medicare providers is not minor or insubstantial.  The United States regularly prosecutes violations of the AKS.  The criminal nature of AKS violations highlights the importance to the government of compliance with its provisions.  The government does not pay for government health-care-program claims that are the product of AKS criminal conduct, and to submit such a claim for reimbursement effectively asks the government to fund criminality retroactively, a result that would be proscribed by the Anti-Kickback Statute.  42 U.S.C.S. § 1320(a)-7b(b).  The government does not get what it bargained for when a defendant is paid for services tainted by a kickback.  Compliance with the AKS therefore factors into the government's reimbursement decision.  Moreover, CMS payment-form 1500 and ASC Medicare enrollment form CMS-855B identify compliance with the AKS as a requirement for the provider to bill Medicare, further demonstrating the materiality of AKS-compliance to the payment of claims.

411502.1

### 2.   The Stark Law

127.    Similar to the AKS, but more targeted, the Stark Law prohibits any healthcare provider from submitting claims to Medicare or Medicaid for payment based on patient referrals for specific "Designated Health Services" from physicians who have an improper "financial relationship" (as defined in the statute) with the provider.  42 U.S.C. § 1395nn(a)(1); *see also* 42 U.S.C. § 1396b(s) (extending Stark to Medicaid).

128.    As of January 1, 1995, Stark applied to patient referrals by physicians with a prohibited financial relationship for the following twelve "designated health services" ("DHS"): (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; (10) home health services; (11) clinical laboratory services; and (12) outpatient speech-language pathology services.  *See* 42 U.S.C. § 1395nn(h)(6).

129.    Therefore, a physician is prohibited from making referrals for any DHS for patients covered by Medicare or Medicaid to an entity with which he or she has a prohibited financial relationship.

130.    The Stark Law broadly defines prohibited financial relationships to include any "direct or indirect compensation arrangement . . . with an entity that furnishes DHS."  42 C.F.R. § 411.354(a)(1).  An entity "furnishes" DHS if it has performed or billed for any services that are DHS.  42 C.F.R. § 411.351.

131.    As with the Anti-Kickback Statute, the Stark Law provides narrow safe harbor protections for some arrangements in which a physician is paid by an entity to which he or she

34

sends referrals, including, among others, a safe harbor for remuneration not tied to the volume or value of any referrals made by the physician. *See*, *e.g.*, 42 C.F.R. § 411.357(c) (safe harbor for "bona fide employment relationship"); *id.* § 411.357(d) (safe harbor for "personal services arrangement"); *id.* § 411.357(c)(4) (safe harbor for "productivity bonuses"); *id.* § 411.357(l) (catch-all safe harbor); *id.* § 411.357(p) (safe harbor for indirect compensation arrangements).

132.    Even fixed compensation is prohibited when it takes into account the volume or value of referrals or other business generated by a referring physician. This is the case when the payment is in some way related to the volume of historical or expected referrals. *See United States ex rel. Drakeford v. Tuomey Healthcare Sys.*, 675 F.3d 394, 408 (4th Cir. 2012); *United States ex rel. Singh v. Bradford Reg'l Med. Ctr.*, 752 F. Supp. 2d 602, 631 (W.D. Pa. 2010); 69 Fed. Reg. 16054, 16059 (Mar. 26, 2004) (fixed aggregate compensation prohibited when it, *e.g.*, "exceeds fair market value for the items or services provided or is inflated to reflect the volume or value of a physician's referrals or other business generated").

133.    There are also special compensation provisions for physician members of "group practices" as defined by the Stark Law. 42 C.F.R. § 411.352. Physicians in group practices can be compensated through profit shares and productivity bonuses, but only insofar as these payments are not calculated in any manner directly related to the volume or value of the physician's referral of DHS. 42 C.F.R. § 411.352(i). The requirements for a physician group to qualify as a "group practice" are extensive and must be met precisely for these compensation methodologies to be available.

134.    Significantly, the "group practice" rules protect from Stark Law scrutiny only referrals from physician group members to other members of the group or the group itself. The "group practice" rules do not protect referrals to a hospital or other non-group entity. Thus, the

Stark Law is implicated if a provider pays physicians who are members of a group (either directly, or indirectly by way of payments to the group that are then funneled to the individual physicians) any amounts that vary with or take into account the volume or value of the referrals from the physician to the provider.  *See* 66 Fed. Reg. 856, 869 (Jan. 4, 2001) (compensation to physicians may "not vary with or otherwise reflect either referrals to the group (to comply with the employee exception) or referrals to, or other business generated for, the hospital (so that it does not qualify as an indirect compensation relationship).").

135.    Providers may not bill Medicare or Medicaid for any DHS furnished as a result of a prohibited referral, and the government may not make a payment for DHS provided in violation of Stark.  *See* 42 U.S.C. §§ 1395nn(a)(1)(B), (g)(1); 1396b(s).

136.    Similarly, if a person collects payments billed in violation of the Stark Law, that person must refund those payments on a "timely basis," defined by Medicare regulations as not to exceed 60 days.  *See* 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d); 42 C.F.R. § 1003.101.

137.    Additionally, violations of the Stark Law may subject the physician and the billing entity to exclusion from participation in federal healthcare programs and various financial penalties, including:  (a) a civil money penalty of up to $15,000 for each service included in a claim for which the entity knew or should have known that the payment should not be made; and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited.  *See* 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

## V.    ALLEGATIONS

138.    As alleged below, from at least 2005 to the present, the DaVita Defendants have engaged in a diverse series of fraudulent schemes through their provision of dialysis and related services to patients with ESRD, including paying illegal kickbacks and improperly billing for laboratory services and prescription drugs.  Through the DaVita Medical Group division, the DaVita Defendants also have falsely billed Medicare for medically unnecessary hospice services.

139.    The MA Defendants have engaged in a fraudulent scheme by paying kickbacks to physicians participating in the MA program to increase referrals and inflate diagnosis codes to increase the capitation payments the defendants receive from Medicare.

### A.    DaVita Pays Kickbacks to Physicians, Competitors, and Patients to Secure Referrals for Dialysis, Pharmacy, and Other Services

140.    DaVita has paid numerous types of illegal kickbacks to secure a steady flow of referrals to its dialysis centers, as well as to its laboratory and pharmacy businesses, in violation of the AKS and the Stark Law.

#### 1.    Kickbacks to Physicians

141.    DaVita's dialysis business is almost entirely dependent on referrals from nephrologists who practice near DaVita's dialysis centers.  To attract and retain referral sources, DaVita has engaged in an ongoing pattern of providing sweetheart deals in connection with the construction of dialysis centers and vascular access centers to physicians in a position to refer patients to DaVita facilities.

142.    These improper inducements violate the AKS or the Stark Law.  Accordingly, any claims for services resulting from these kickback-tainted referrals are false claims within the meaning of the FCA.

411502.1

a.      **Kickbacks to Help Referring Physicians Build and Operate Vascular Access Centers**

143.    DaVita's subsidiary RMS Lifeline, Inc., d/b/a Lifeline Vascular Access ("Lifeline"), develops and manages Vascular Access Centers ("VACs") that provide vascular procedures, primarily to dialysis patients.  At its peak, Lifeline operated approximately 75 VACs pursuant to management and administrative services agreements.

144.    VACs are lucrative for doctors to own, but they are expensive to build.  The costs of construction and necessary equipment are approximately $1.5 million for an average VAC.

145.    DaVita provides financial support to nephrologists who refer or are in a position to refer a substantial number of patients to DaVita's dialysis centers to build VACs.  To reward these high-referring physicians, DaVita offers them financial inducements in the form of:  (1) favorable financial terms to finance the physician's investment in the VAC; (2) variable "royalty" and "management fee" deals that reflect the volume of referrals; and (3) loan forgiveness in the event the VAC becomes unprofitable.

146.    The loans DaVita offers its chosen doctors contain terms that are far better than those available in the open market.  For example, many loans are for 100% of the construction value of the VAC, with no down-payment requirement.  Such a term would not be available from a market lender.

147.    DaVita also approves loans while either ignoring or having very low standards for creditworthiness.  Some of the doctors who receive loans would not qualify with a market lender, particularly without a down payment.

148.    Further, the only "repayment" requirement for the loans is through DaVita's management agreements with the doctors.  Lifeline manages the VACs for the physician owners, who pay a royalty rate ranging from 7 to 25%.  Remarkably, this royalty rate is not based on the

38

difficulty of managing the center.  Instead, the rate is set based on DaVita's determination of the value of the partnering doctor's dialysis referral stream; doctors with larger referral streams receive the best rates.  Moreover, although DaVita reduces its management fees whenever Medicare reimbursements rates decrease, DaVita never raises its fees when those rates increase. DaVita also sometimes renegotiates rates in the middle of the loan term to provide an additional incentive to doctors who threaten to refer their dialysis patients elsewhere.

149.    DaVita offers these better-than-market loans only to doctors with a certain minimum number of referrals.  This minimum is analyzed and changed each year to ensure that the loans are used as incentive bonuses to retain the most valuable referral sources.  Notably, many of the doctors selected also serve as dialysis center Medical Directors and are already highly compensated by DaVita.

150.     On at least one occasion, DaVita suspended this loan program due to pressure from its compliance side.  Ultimately, after pressure from the "business side," DaVita restarted it. During the period when DaVita was not funding loans for VACs, it tried to use its influence with banks to secure favorable loans for its valuable doctors, underscoring the efforts DaVita made to provide remuneration to its referral sources.

151.    On several occasions, unprofitable VACs were closed by the operating doctors, including in Puerto Rico and elsewhere.  This occurred particularly in 2016, when Medicare reimbursement rates changed to make procedures performed in VACs less profitable than those performed in ASCs.  In several such cases, DaVita made no attempt to collect the unpaid balance of the loan and instead wrote it off over time.

152.    In other cases, DaVita purchased 60% of a VAC to turn it into an ASC.  When it did so, DaVita paid substantially more than fair market value.  Moreover, sometimes the

operating doctors still had outstanding loan balances with DaVita at the time of this purchase; as part of the purchase, DaVita was able to reduce or eliminate these outstanding balances, thus providing additional value to the doctor(s).

153.    Further, DaVita annually evaluates each VAC to determine whether it is more profitable to perform any given vascular procedure in a Medicare-certified ASC or a practice-based, fee-for-service VAC.  In some cases, DaVita games the system by claiming to operate under the same roof both an ASC co-owned by DaVita and a practice-based VAC.  DaVita then steers patients to whichever setting—in the same building—provides the highest reimbursement rate for any given procedures.  This "hybrid" arrangement, which is designed to finesse higher reimbursements from Medicare, violates the regulatory safe-harbor that permits physicians to own ASCs.  *See* 42 C.F.R. § 1001.952.

154.    DaVita provides the further benefit of free marketing to its targeted physicians who open VACs by using its personnel in the DaVita dialysis clinics to encourage patients to use a Lifeline VAC.

155.    DaVita offers and provides physicians these favorable terms and other significant financial benefits in connection with these VACs with the intent to induce referrals.  These financial arrangements are precisely the types of remuneration that CMS warned against in its guidance concerning problematic joint ventures.  The financial arrangements are designed "not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for these referrals." U.S. Dep't of Health & Human Servs., Office of the Inspector Gen., Special Fraud Alert (Dec. 19, 1994).

411502.1

**b.       Payments to Johns Hopkins Nephrologists**

156.    In a similar vein, for over a decade, DaVita has been providing illegal remuneration to physicians practicing with the Johns Hopkins University School of Medicine by first giving them, and then "buying back," rights of first refusal to place medical directors in new DaVita dialysis clinics.

157.    In 2005, DaVita acquired Gambro Healthcare, Inc., then one of the largest dialysis providers in the United States and Relator's employer.  At that time, Johns Hopkins' nephrologists largely, if not exclusively, sent their patients to Gambro facilities for dialysis, laboratory and related services.  Upon DaVita's acquisition, it was unclear if the Johns Hopkins physicians would use DaVita's facilities or transition to one of DaVita's competitors.

158.    To induce Johns Hopkins' physicians to refer their dialysis patients to DaVita, DaVita built the foundation for an illegal kickback scheme into their renewal contract with Johns Hopkins.  Specifically, DaVita provided the Nephrology Department at Johns Hopkins with the right of first refusal ("RFR") to place any of its physicians as the medical director in any new DaVita dialysis facility in a wide geographic region, not limited to Hopkins' then-current market area.

159.    DaVita gave Johns Hopkins these RFRs essentially for free—the terms of the contracts were already favorable to Johns Hopkins before the RFRs were added.  In fact, on numerous occasions, Relator has heard DaVita executives state "how rich" the deal was for Johns Hopkins and express surprise that the deal "was able to make it through compliance." Accordingly, on information and belief, Relator alleges that the deal with Johns Hopkins contained additional "sweetheart" terms, above and beyond the RFRs, intended to reward Johns Hopkins for its continued referrals to DaVita's facilities.

41

160.    DaVita provided these RFRs even though it knew that Johns Hopkins had no desire to expand its clinical footprint beyond the Baltimore area, and it thus had no reason to expect that Johns Hopkins would exercise the RFR.  Nonetheless, in at least a half a dozen instances when DaVita has sought to open a new clinic in Maryland, the company has approached Johns Hopkins to "buy back" the RFR for approximately $75,000.

161.    DaVita CEO Kent Thiry personally negotiated the 2005 arrangement with Johns Hopkins.

162.    In 2016, Johns Hopkins severed its ties with DaVita, opting instead to form joint ventures with Fresenius Medical Care.  On information and belief, Relator alleges that Thiry unsuccessfully offered Hopkins significant, and illegal, monetary inducements in an attempt to persuade Hopkins to continue sending its valuable referrals to DaVita.

163.    By paying Johns Hopkins to refer patients to its dialysis clinics—in the guise of offering free "rights of first refusal" and then buying them out—DaVita has knowingly violated the federal Anti-Kickback statute's prohibition on monetarily inducing referrals for federally-funded healthcare services.

164.    These payments to Johns Hopkins also violated the Stark Law, as they induced John Hopkins physicians to refer their patients to DaVita to receive DHS such as labwork and prescription drugs.

### 2.    Collusive Kickback Arrangement with Fresenius Concerning DaVita Rx and Dialysis Supplies

165.    DaVita's use of kickbacks and illegal financial inducements to ensure a steady stream of referrals is not limited to the more traditional payments to referring physicians.  In fact, DaVita has engaged in substantial kickback-tainted transactions with Fresenius, its largest competitor.

411502.1

166.     Fresenius Medical Care is a for-profit healthcare group that provides products and services for dialysis, hospitals, and outpatient medical care around the world.

167.     Fresenius Medical Care and DaVita Kidney Care are the two largest dialysis providers in the United States.  In 2016, Fresenius served approximately 184,000 dialysis patients while DaVita served approximately 181,000 patients; in contrast, the third largest dialysis provider, U.S. Renal Care, served approximately 24,000 patients.

168.     Another significant line of business for Fresenius is the sale of dialysis equipment, drugs, and supplies to other dialysis providers, including DaVita.

169.     In approximately late 2012 or early 2013, DaVita and Fresenius entered into an arrangement whereby Fresenius agreed to make DaVita Rx's non-dialysis drugs available to its dialysis patients and, in some circumstances, to encourage or pressure its dialysis patients to use DaVita Rx.

170.     In exchange, DaVita provided Fresenius with two significant financial inducements.  First, DaVita agreed to enter into longer contracts to purchase Fresenius dialysis products, which are largely paid for by Medicare as part of the dialysis bundle.

171.     Second, DaVita agreed to purchase nine of Fresenius's European dialysis clinics—five in Portugal and four in Poland.  At the time of the purchases, European antitrust regulators were scrutinizing Fresenius's European holdings and Fresenius was receiving pressure to divest from certain assets, but it could not find anyone to purchase its troubled clinics.

172.     DaVita's illegal kickbacks paid off.  After DaVita entered into the arrangement, DaVita Rx's revenues nearly doubled due to increased referrals from Fresenius.

173.     In offering and providing remuneration to Fresenius, DaVita intended to and did induce Fresenius to refer its dialysis patients to DaVita Rx.  This inducement and DaVita

411502.1

subsequently seeking reimbursement from government payors for drugs obtained by these Fresenius-referred patients violate the federal Anti-Kickback Statute and the Stark Law.  As discussed above, those laws prohibit the provision of anything of value—here, DaVita's promise to purchase more dialysis equipment and its purchase of nine European dialysis clinics—to induce referrals for items or services, including outpatient prescription drugs under the Stark Law.  As previously noted, the FCA defines as false any claims submitted for reimbursement that are tainted by kickbacks.

174.    In another example of the improper relationship between DaVita and Fresenius, in or around late 2007, DaVita's Kent Thiry engaged in direct negotiations with Fresenius's CEO Rice Powell concerning the price DaVita paid Fresenius for certain dialysis drugs.  Powell objected to giving DaVita a direct discount on these drugs, arguing that doing so would lead Medicare to reduce the bundled dialysis payment in subsequent years.  Instead, Powell offered to mask the drug discount by giving DaVita a steep discount on its purchases of Fresenius-manufactured dialysis equipment, such as machines, dialyzers, and bloodlines.  In essence, Fresenius maintained an inflated price for dialysis drugs by subsidizing DaVita's drug purchases through the provision of discounts on equipment.

175.    The drugs at issue are reimbursed by Medicare as part of the ESRD bundled payment.  Because Medicare re-prices the ESRD bundle each year based on the historic rates paid by providers for the bundle's components, DaVita and Fresenius's quid pro quo fixed the bundle's price at an artificially high point, thereby causing Medicare to reimburse dialysis providers at an unlawfully inflated rate.

411502.1

### 3. Illegal Kickbacks to Patients: Improper Waiver of Patient Payment Obligations

176.　In addition to kickbacks to doctors and competitors, DaVita also pays illegal kickbacks in the form of co-payment waivers to patients to encourage them to pick DaVita over its competitors.

177.　DaVita improperly waives patient co-payment and co-insurance obligations without determining that collecting the amounts would cause the patient an undue financial hardship (as required by Medicare rules).  Even when DaVita does not write off these patient obligations up front, it deliberately fails to take reasonable steps to collect the amounts later, essentially waiving the patients' requirement to pay.

178.　For example, DaVita Rx regularly waives the otherwise-required patient co-pays to induce patients to use its prescription services.  DaVita Rx either waives the co-pays upfront or sends letters to patients stating that the co-pays are owed, but makes no bona fide effort to collect them.

179.　Similarly, DaVita Kidney Care routinely waives the required co-payments for its dialysis services, again without assessing a patient's financial need.  In fact, DaVita Kidney Care has not even created a system for tracking dialysis patients who have failed to make required co-payments, let alone an effective mechanism for collecting those debts.

180.　DaVita waives or fails to pursue collection of copayments deliberately to attract and retain patients.  DaVita's leadership has often discussed that engaging in co-payment collection efforts could drive its dialysis patients to its primary competitor, Fresenius.

**B.**     **DaVita Medical Group, Heritage, and Regal Use Kickbacks to Induce Physicians to Refer Medicare Advantage Patients to Them, and They Engage in Illegal Upcoding**

181.     The MA Defendants DMG, Heritage, and Regal provide care to hundreds of thousands of patients who are enrolled in Medicare Advantage plans.  Medicare Advantage plans receive capitation payments from Medicare to facilitate the provision of medical care to plan enrollees.  The MA Defendants, in turn, contract with Medicare Advantage plans to provide this care to plan enrollees; in exchange, the MA Defendants receive a significant portion of the capitation payments directed to the Medicare Advantage plan by Medicare.  As a result, when the MA Defendants treat a patient enrolled in a Medicare Advantage plan with which they have contracted, the MA Defendants are able to functionally bill Medicare for all or substantially all of the medical care provided to the patient.

182.     The MA Defendants have each engaged in two practices that result in the fraudulent submission of claims to Medicare through the Medicare Advantage plans.

183.     First, the MA Defendants have each engaged in a kickback scheme concerning the Medicare Advantage program that is becoming increasingly common in the industry.  Under this scheme, they provide primary care physicians serving a large population of Medicare Advantage patients with substantial financial inducements to cause those physicians to steer their Medicare Advantage patients to the MA Defendants.

184.     Detailed further  below, the MA Defendants provide the physicians—who have substantial influence over their patients' choice of a Medicare Advantage plan—with up-front cash payments, ongoing bonuses, valuable information technology assistance, and other valuable consideration.  In exchange, the doctors refer patients to Medicare Advantage plans with which

411502.1

the MA Defendants have contracted—thus giving the MA Defendants the right to receive the majority of Medicare's payments for the patient's medical care.

185.    This fraudulent scheme is barred by the AKS, which prohibits giving anything of value to induce or reward any person for referring, recommending, or arranging for the purchase of any item or service for which payment may be made under a federally-funded healthcare program.  42 U.S.C. § 1320a-7b(b).

186.    Second, as discussed further below, the MA Defendants also use their influence over the physicians to fraudulently inflate the patients' risk adjustment scores, an illegal practice known as upcoding that increases the capitation rates Medicare pays for those patients.

### 1.    The Kickback Scheme

187.    Through the Medicare Advantage program, Medicare pays health plans a fixed capitation rate, calculated per member per month, to cover all of the medical care needed by each Medicare Advantage member.  This capitation rate has two primary components:  (1) the base rate is set considering demographic factors such as age, gender, and location of the member; and (2) an additional amount is paid based on the member's health status through a process known as "Risk Adjustment."

188.    Many Medicare Advantage plans sub-contract a significant portion of the responsibility for managing patient care to large provider groups such as DMG, Heritage, and Regal.  Typically, the Medicare Advantage plans pay the provider group a percentage (often 85%) of the total capitation payment the Medicare Advantage plan receives from Medicare.

189.    Under these sub-capitation contracts, the MA Defendants become responsible for providing all of the medical care the member needs—either directly through their own provider

networks or by contracting with third-party physicians, hospitals, or other providers to provide the care.

190.    DMG, for example, provides medical care through both models.  Through a group model, DMG employs directly (where permitted by state law) or through associated physician groups, approximately 700 primary care physicians.  Through its "Independent Physician Association" (IPA) model, DMG contracts with a network of more than 2,500 associated groups and other network primary care physicians who provide care for DMG members in an independent office setting.  To complement these physicians, DMG also contracts with several thousand network specialists and approximately 200 network hospitals that provide specialty or institutional care to patients.

191.    Through the sub-capitation process, whenever a Medicare Advantage plan member commits to using a doctor employed by or affiliated with an MA Defendant as their primary care physician ("PCP"), the MA Defendant has functionally secured the right to bill Medicare (in the form of the sub-capitation payment received by the MA Defendant from the Medicare Advantage plan) for all of that member's medical care.  In general, the right to receive the sub-capitation payment goes to whichever physician or physician group is designated the Medicare Advantage member's PCP.

192.    By way of example, assume that Patient A is a member of Humana's Medicare Advantage plan, and has selected Dr. Smith as her PCP.  If Dr. Smith is employed by DMG, and Humana has a sub-capitation arrangement with DMG, then DMG will receive a portion (*e.g.*, 85%) of the capitation rate Humana receives from Medicare every month to provide care to Patient A.  Similarly, assume that Patient B is also a member of a Humana Medicare Advantage plan, but his PCP is Dr. Jones, who belongs to a mid-sized regional Independent Physician

411502.1

Association.  If the IPA agrees to contract with DMG, then DMG will receive 85% of Humana's capitation rate for providing care to Patient B—and the right to control who provides medical care to Patient B.

193.    When one of the MA Defendants hires a physician or secures his or her affiliation, they typically receive all or nearly all of that physician's patients, because patients tend to be more loyal to their PCP than to any insurance plan or large provider network.

194.    This influence over their patients, coupled with the structure of the capitation contracts, means that PCPs provide a lucrative referral stream that can be captured by the MA Defendants.  For example, for the year ended December 31, 2016, 83% of DMG's operating revenue, or $3.431 billion, was derived from multi-year capitation contracts with health plans. Of this, $2.537 billion came from Medicare or Medicare Advantage plans and $193 million came from Medicaid managed care plans.

195.    Accordingly, the MA Defendants target PCPs with a substantial number of Medicare Advantage patients, in order to increase the number of Medicare Advantage plan members under the MA Defendants' care.  The MA Defendants are fully aware—indeed, they intend—that this tactic, in turn, allows them to secure the members' lucrative capitation rates through sub-capitation contracts with the relevant Medicare Advantage plans.

196.    For example, in an August 5, 2013, presentation titled "HCP Growth Tracks: Volume to Value Business Model Discussion," DMG's executive leadership set forth the various criteria for determining which physicians to pursue.  Foremost among them was the requirement that "the potential geographic market(s) in which [the] group/IPA exists . . .  should have [a] high probability of ≥ [10,000] MA risk lives and/or [50,000] commercial risk lives in 3 years or less." Additionally, the "specific group/IPA being considered" for acquisition or affiliation should be

"PCP [Primary Care Physician] dominant."  As noted, patients—and their associated capitation payments—tend to follow their PCPs

197.    Likewise, in July 2014, the leadership of DMG's Florida Division discussed a presentation slide deck titled "Project Lightning."  The deck set forth plans to expand DMG's presence in Orlando—a "growing market" with "255,000 Medicare eligible" and "44% Medicare Advantage penetration."  More specifically, the deck provided an update on DMG's proposed acquisition of Family Physicians Group (FPG), the "largest employed medical group in [the] Orlando area with ~30k MA [Medicare Advantage] members."

198.    Similarly, Relator received an email on October 9, 2014, from Bill Palmer, HCP's Vice President of Business Development, regarding the acquisition of the Everett Clinic in the Seattle, Washington area.  Using bold font, Palmer emphasized the clinic's "97 PCPs" and "10k MA" lives.  As to the Seattle market more broadly, Palmer highlighted "136k MA enrolled; 375k MA eligible; 36% penetration of which 85% is HMO."

199.    To induce these targeted physicians serving a significant number of Medicare Advantage members to join or affiliate with them, the MA Defendants provide a range of improper inducements, including offering large sign-on or retention bonuses or paying an inflated price to buy a physician's practice.

200.    For example, during a July 31, 2015, presentation titled "IPA Region 1 Long-term exclusive contract / Doc Relations," DMG's executive leadership team discussed the terms of its "exclusive contract offering" for southern California physicians.  At the time, DMG was renegotiating these physicians' five-year contracts and wanted the physicians to remain affiliated with DMG and have exclusive use of the DMG network.  The presentation grouped the region's DMG-contracted physicians into one of three tiers, with each tier expressly defined by the

411502.1

number of seniors (*i.e.*, Medicare recipients) under the physicians' care:  "Platinum" providers served ">200 seniors"; "Gold" providers served "100-200 seniors"; and "Silver" providers served "<100 seniors."  In turn, the presentation proposed offering exclusivity "signing bonuses" to providers that corresponded to their tier classification—$40,000 for Platinum, $20,000 for Gold, and $10,000 Silver.  The presentation explained that "exclusive physicians have larger panels with [DMG]"—in other words, exclusive physicians drive more Medicare Advantage patients and their associated capitation payments to DMG.

201.    Defendant Heritage Provider Network has paid even higher kickbacks to physicians to obtain their exclusive affiliation and their Medicare Advantage business.  Heritage regularly has offered $100,000 to $200,000 bonuses to physicians in exchange for their agreement to affiliate exclusively with one of Heritage's provider networks, defendant Regal Medical Group, and thus bring their valuable stables of patients to their company.  DaVita has attempted to compete with these bonuses in order to keep or secure valuable referral sources.

202.    Although Relator is not an insider at Heritage or Regal, he has substantial information about their business practices with respect to physician compensation and Medicare Advantage, because physicians with offers of bonuses from Heritage and Regal often will come to DMG to attempt to secure even higher kickbacks.  Indeed, such physicians routinely provided DMG with copies of their Heritage or Regal contracts, which offered lucrative sign-on bonuses in exchange for exclusively affiliating with them (and thus sending them their Medicare Advantage patients).  As a result, Relator has had the opportunity to review numerous examples of the types of improper inducements offered by defendants Heritage and Regal.  At least one former Heritage executive also left to work for DaVita.

411502.1

203.     Both Heritage and DMG prefer, when a physician is amenable, to acquire the physician's practice outright and then employ the physician directly or through an affiliated medical group.  When they do so, both Heritage and DMG routinely pay well in excess of the fair market value for the physicians' practices to obtain their employment and access to their Medicare Advantage patients.  Paying beyond fair market value with the intent to induce referral business paid by government healthcare programs constitutes an illegal kickback under the AKS.

204.     The MA Defendants also provide financial incentives—through direct bonuses, enhanced capitation payments that increase their compensation, or otherwise—to physicians to cause them to convince patients who are not enrolled in Medicare Advantage plans to join such plans and to steer those patients who are already enrolled towards the Medicare Advantage plan that provides the MA Defendant the best financial terms.  The relative profitability of any given Medicare Advantage plan varies based on the sub-capitation rate the MA Defendant is able to negotiate with each plan.  To encourage its physicians to steer patients into the most lucrative plans, DMG regularly informs its affiliated and employed physicians of the relative sub-capitation payments DMG receives from the various Medicare Advantage plans with which it contracts.  For instance, DMG has told its affiliated physicians that "every patient who switches from Humana to United results in an extra $27 PMPM [per member, per month] payment."

205.     As an example of what results from this pressure, during Medicare's open enrollment periods, when patients can switch plans, DMG physicians often tell their patients (falsely) that they might stop seeing patients enrolled in certain Medicare Advantage plans—*i.e.*, those plans that do less for DMG's bottom line—to convince patients to enroll in plans that generate higher sub-capitation payments for DMG.

206.    To ensure that patients are willing to follow their physicians' advice about plan enrollment, DMG has launched a "know your physician program" directed at shifting patient loyalties from their Medicare Advantage plan to their DMG-affiliated or employed primary care physician.

207.    DaVita also pays illegal kickbacks to physicians by waiving the normal fees for the use of DaVita's electronic health record ("EHR") system in order to induce some IPA physicians to affiliate exclusively with DMG.  Purchasing or leasing an EHR system can cost thousands of dollars, rendering access to a free, pre-existing system extremely valuable.  The OIG has expressly warned that the "provision of software or information technology to a referral source should be scrutinized for compliance with the Federal anti-kickback statute."  OIG Alert, OIG Policy Reminder: Information Blocking and the Federal Anti-Kickback Statute (Oct. 6, 2015).  OIG has carved out a safe harbor for the donation of EHR systems to physicians under certain circumstances, but DMG does not meet its terms, because it conditions the free use of its EHR system on a physician's willingness to affiliate exclusively with, and thus refer patients exclusively to, DMG.  *See* 42 C.F.R. § 1001.952(y)(4).

208.    In 2015, DMG informed IPA physicians receiving free access to the EHR system that they would be charged $200 per month going forward.  When numerous doctors complained, rather than risk losing their exclusive affiliation and their valuable patients, DMG devised a new scheme whereby these physicians would ostensibly provide "IT expertise" to DMG in exchange for continued free use of the EHR system.  These IPA doctors, who were mostly located in California, did not actually provide "IT expertise" in any form, nor did they perform any other work to compensate DMG for its continued provision of free EHR access.

411502.1

209.     Finally, DMG also provides physicians with valuable patient populations (*i.e.*, Medicare-eligible populations) a substantial financial benefit by allowing them to retain revenue derived from unsupported risk adjustment claims that have been subsequently deleted by the Medicare Advantage plan.  Even though DMG repays the Medicare Advantage plan for the deleted claims (to the extent that DMG received, *e.g.*, 85% of the increased capitation payment caused by the unsupported, and thus false, claim), DMG typically does not claw back the extra revenue the physicians received due to the false claim.

210.     For example, in 2014, DaVita learned that its physicians had broadly misapplied an "E-code" for reaction to spinal puncture.  E-codes are secondary codes used to provide information about a patient's primary diagnosis code; they are typically used to help explain an injury.  As a result of this misapplication, DaVita submitted approximately $140 million worth of false claims to the government.

211.     Based on this information, DaVita repaid the affected Medicare Advantage plans (and thus the United States), but it did not require its doctors to reimburse DaVita from the funds they had received as a result of the misapplied codes.  In July 2014, Prati Batal, the president of DMG's California market, authored a presentation titled "DHCP Monthly Dashboard: CA Market."  One slide, "RADV-Risk Adjustment Data Validation," states: "Payment Recovery . . . unsure if or how payment recovery will be passed on to provider groups."  To ensure that its physicians would continue billing their Medicare Advantage services to the DMG network, DaVita elected not to claw back the doctors' unlawfully obtained gains, instead letting the doctors retain them as additional, unwarranted compensation (and sending the message that fraudulent billing would only have an upside for them).

54

411502.1

212.     In brief, DMG compensates its employed and affiliated physicians in a manner designed to induce them to channel Medicare Advantage patients, and their corresponding capitation payments, to DMG, in violation of the Anti-Kickback Statute.  Federally insured patients are not numbers on a balance sheet; they are individuals entitled to make informed healthcare decisions untethered to the bottom-line of any given provider.  The Anti-Kickback Statute was designed to protect quality of care, by ensuring that doctors were not swayed by financial matters, but DaVita has flaunted both the statute and the idea that patients' care should come first.

### 2.     Upcoding Risk Adjustment Scores and Claims

213.     As part of its fraudulent Medicare Advantage scheme, DMG also has exerted substantial pressure on its physicians to inflate the diagnoses for which they purport to have treated their Medicare Advantage patients in order to inflate the risk-adjustment payments they claimed for these patients.

214.     As a result, DMG has submitted and caused the submission of (by the patient's Medicare Advantage plan) these claims for risk adjustment payments even though it knew, or in the exercise of reasonable care should have known, that the claims were based on (1) diagnoses for which patients had not been treated in the prior year in a face-to-face visit with an appropriate provider type, (2) diagnoses that the patient did not actually receive, or (3) diagnoses that are otherwise disqualified under CMS risk adjustment rules.

215.     DMG routinely submits claims based on patient visits that did not involve providing any medical care, but instead were conducted simply to allow DMG to secure higher risk adjustment payments by claiming the patients had been "treated" in the calendar year.  As discussed above, a diagnosis code submitted to CMS without the patient's having been treated

411502.1

for the condition in a face-to-face encounter in the prior year is not eligible for a risk adjustment payment.

216.    For example, DMG created a home visit program targeting its Medicare Advantage members in Las Vegas, Nevada.  DMG hired a home visit company to offer "comprehensive coding visits" to these patients.  These visits were conducted exclusively for the purpose of capturing diagnosis codes that otherwise would not have been captured, because the patients had not seen a physician.

217.    DMG neither offered nor provided medical care in these visits, and no follow-up care occurred.  This was the case even though the purpose of risk-adjustment payments from the government is to compensate the provider for the additional care that should be provided to treat the risk-adjusted conditions.  Because there is such a strong incentive to increase the payments from CMS without providing care is exactly why compliance with the applicable laws and regulations that combat fraud, waste, and abuse is mandated as an essential part of the agreement with CMS.

218.    Internally, DMG referred to its home visit program as a "Patient Outreach Campaign."  The campaign created "target pursuit lists"—*i.e.*, patients it believed were susceptible to "coding improvement"—and DMG Nevada provided "weekly progress tracking" updates to senior leadership, including Relator, that documented the number of home visits completed with "targets" (elderly patients) of both DMG employed and affiliated physicians.

219.    DMG used this home visit company despite knowing that many of the diagnoses it submitted were false.  When DMG hired a third-party auditor to review the diagnoses submitted based on this program, the audit showed that 37% of the diagnoses submitted based on

411502.1

these visits did not meet the standards required by CMS rules and thus were invalid to submit to

CMS as the basis for increased risk adjustment payments.

220.    Home visits conducted exclusively to increase risk scores are not confined to

DMG's Nevada operations.  In California, for instance, DMG implemented a similar program

called "Seniors Without Visits" (SWV).  The goal of the program was to ensure that every

Medicare Advantage patient had at least one face-to-face visit with a DMG provider each year

for the purpose of increasing risk adjustment scores—and, critically, not for the purpose of

treating any of the conditions identified.  An internal spreadsheet from May 2013, "HCP CA: 3

Year Growth Strategy," explained the need to "maximize HCC scores for non-engaged providers

and staff" and insisted that "[e]very region needs to have an SWV program."

221.    DMG is so focused on funneling these "members without visits" into a setting

where their diagnoses can be "captured" that it offers the members illegal kickbacks to persuade

them to visit their doctors.  The point of these visits is not for the patients to receive additional

care, but for DMG to increase its risk adjustment payments by "treating" the patient for a

condition for which DMG can subsequently seek a risk adjustment payment.  To induce these

medically pointless visits, DMG routinely offers and rewards patients with cash equivalents such

as gas cards, credit card vouchers, and even debit cards with cash balances.  Notably, DMG does

not provide similar incentives to encourage patients to visit their doctors for follow up care or

annual physicals if DMG has already "captured" that member's risk adjustment diagnoses for the

year.

222.    DMG is aware that its providers regularly submit erroneous diagnosis

information, particularly as to diagnoses that are frequently miscoded.  Yet it performs almost no

quality-review work to ensure the accuracy of the diagnosis codes it submits to CMS for risk

adjustment payments, even though it simultaneously conducts extensive reviews of patient charts to capture additional diagnoses that physicians may not have coded.

223.    DMG employs full-time staff to review patient charts to ensure the "completeness" of the coding (*i.e.*, to capture all codes that appear in the charts), but it does not instruct these reviewers to check the accuracy of previously submitted diagnoses.  Such one-way quality control is impermissible.  *See* 65 Fed. Reg. 40170 at 40268.

224.    Similarly, DMG built audit capabilities into its EHR system to capture missed diagnoses, but it did not use these same capabilities to check submissions for unsupported diagnoses.

225.    As internal documents demonstrate, DMG views risk adjustment as a profit center, not as a means to improve clinical outcomes for its patients.  Indeed, although there was internal discussion of adding a follow-up clinical care initiative to treat patients for any legitimate conditions that were coded as a result of these visits, no such steps were ever taken.

226.    An April 2014 presentation slide deck, "HCP Planning and Analysis," lists HCCs as a "key metric."  The deck then lists the "percent of MA Patients with no HCC," "Average Number of HCC Categories per MA Patient," and "Chronic Condition Recapture Rate" among the metrics for evaluating the "HCC Team."

227.    In another 2014 deck, "HCP Holdings 2014 Budget Presentation," DMG noted that its budget assumptions for the Arizona market—from which DMG divested in 2016—were informed by $9.1 million in anticipated revenue from "RAF [risk adjustment factor] improvement" for its "senior premiums."  In turn, these assumptions rested on, *inter alia*, a "projected increase due to implementation of enhanced processes and maturation of existing programs implemented in 2012 and 2013."  The deck also noted that an unanticipated capitation

rate recalibration had undermined these revenue projections, requiring "significant effort . . . to achieve budgeted HCC/RAF."  A July 2015 deck, "HCP Business Development Update," appears to confirm the success of these efforts:  "Expecting significant RAF adjustments for 2014."

228.    DMG also pressures physicians to increase the quantity of diagnoses they submit with little concern for the accuracy of those diagnoses.  DMG applies this pressure through a combination of:  (1) aggressive coding training; (2) detailed reporting on physician coding practices; and (3) financial incentives.  Notably, DaVita includes risk-adjustment metrics as a line-item in physician compensation.

229.    First, physicians are pressured to attend training seminars about risk adjustment coding.  For example, in the 2013 spreadsheet "HCP CA: 3 Year Growth Strategy," discussed above, one strategy for revenue improvement was to "standardize HCC education for physicians and staff and provide incentive."  Another 2013 deck discussing the Nevada market noted that "122 clinicians completed HCC enrichment training."  These trainings focus almost exclusively on capturing the most lucrative diagnosis code possible, not on correcting known errors.

230.    Second, DMG calculates and reviews the average risk adjustment score for each physician on a monthly basis.  DMG reviews these scores before and after physician training sessions to ensure that the training had its desired effect—driving up risk adjustment scores.

231.    Third, DMG financially incentivizes physicians to increase their risk scores.  Until approximately 2015, physician compensation calculations included a specific line item for "RAF improvement," based on the average risk score for the physician's patients.  In 2015, DMG tried to move away from explicitly rewarding physicians for RAF improvement, but the physicians who were generating significant risk adjustment revenue rebelled.  Accordingly, an

attempt was made to create a compensation scheme that had the same effect of compensating physicians based on their risk scores but did not do so directly.  DMG was unable to devise such a methodology.  Instead, physicians continue to be compensated based on their risk adjustment scores, although the relevant line item now has an innocuous title to obscure the true purpose of the payment.

232.    DMG has also invented other means by which to financially incentivize physicians to improve risk adjustment scores.  A July 2014 "Monthly Dashboard" report from the California market contains an "HCC Improvement Plan" outlining "PCP [primary care physician] Engagement Strategies."  These strategies included: "Maximize New Patient Incentive Program," "Re-evaluate PCP Contracts," and "Expand Attestation Incentive." Attestations are documents filled out after a patient visit—often many months later—that purport to amend the medical record to reflect information that the physician ostensibly inadvertently left out of the contemporaneous documentation, with the goal of claiming additional risk adjustments.  Such addenda to medical records are invalid support for a diagnosis unless they comply with strict requirements that are designed to ensure they reflect the care provided and diagnoses reached during the face-to-face encounter.

233.    In addition to currently incentivizing its physicians to increase their submitted diagnoses, DaVita is also aware that HCP/DMG engaged in upcoding before it was acquired by DaVita in 2012.  A reserve of $600 million was placed into escrow following the acquisition based on the recognition that repayments would be due to the government if the upcoding were discovered and stopped.  In a voicemail left by Thiry for Relator on November 19, 2013, Thiry acknowledged as much, commenting that Bob Margolis—the CEO of HCP at the time of its sale

to DaVita—"never really internalized that [HCP] hit the numbers because two-thirds of [its] profit growth was from RAF scores and then adding very modest growth around that."

234.     In the same message, Thiry stated that, under DaVita's watch, HCP/DMG has "got to be a lot more nimble and drive profit growth in other ways."  Thiry did not follow his own directive, however.  In subsequent conversations in front of Relator, Thiry disclosed that DMG's continued revenue growth was due to risk adjustment "upcoding."

235.     Relator also has been told that defendant Regal Medical Group aggressively upcodes diagnoses for patients enrolled in Medicare Advantage plans to maximize both Regal's and Heritage's risk adjustment payments.  In fact, Relator has heard from a former Heritage executive who joined DaVita that not only do Heritage and Regal pressure their physicians to upcode, but Heritage's CEO, Dr. Richard Merkin personally reviews individual patient medical records to add new diagnoses that were not recorded by the treating physician.

236.     In making risk adjustment payments to the MA Defendants, CMS relied on their underlying attestations that the diagnoses they submitted for payment were properly supported by medical records.  In specific instances in which CMS learns that certain diagnoses are invalid, CMS recalculates the risk scores and adjusts associated payments to Medicare Advantage plans to avoid overpayment.  Had CMS been made aware of the upcoding by the MA Defendants, it would not have made risk adjustment payments associated with the unsupported diagnoses and would have recovered any payments already made based on the upcoded diagnoses.

C.     **DaVita Submits Claims for Laboratory Services Performed Without a Valid Physician Order**

237.     As described above, DaVita, through two separately incorporated but wholly owned clinical laboratories, offers lab services to dialysis patients.

411502.1

238.     Payments for lab services related to monitoring and to treating a patient's ESRD are bundled in the single ESRD payment.  However, ESRD patients frequently have other chronic conditions that require treatment.  A patient's physician may order additional tests to monitor and treat these conditions, and such tests are separately payable by Medicare.  For the convenience of the patient, a dialysis center, such as DaVita, may draw blood and process these additional tests and bill payors for them separately, by adding the AY modifier to the procedure code listed on the bill.

239.     To be "medically reasonable and necessary," and thus payable by Medicare, such orders for labwork must:  (1) bear a physician or appropriate non-physician practitioner's signature; and (2) be ordered by the patient's treating physician or non-physician practitioner for the monitoring or treatment of a patient's non-ESRD condition.

240.     DaVita was fully aware of these requirements for billing laboratory services.

241.     DaVita regularly submits claims for payment on lab services despite knowing these requirements are not met.  If CMS were aware of these deficiencies, it would not pay the claims and would claw back any funds it had already paid based on such deficient claims.

242.     Around 2005, while DaVita was completing its acquisition of Gambro, Gambro was in the process of transitioning to a laboratory billing system known as "Esig," which traced whether there was a valid, signed physician order for the labwork at issue.  If the order was not signed, the Esig system would not bill the government or commercial payor at issue for the laboratory services.

243.     At that time, DaVita's lab billing system did not determine whether there was a validly signed physician order to support a claim for laboratory services.  After acquiring Gambro, DaVita considered expanding the Esig billing system to all of its dialysis centers but

determined it would be "cost prohibitive" due not just to the cost of installing new software, but also to the labwork that would go unpaid when the rules were followed.  As DaVita has expanded over the last 11 years, new and refurbished centers were brought online using DaVita's legacy system—not Gambro's Esig system.

244.    DaVita has now moved all of its dialysis centers to a new computer platform known as "Falcon Dialysis," which, like its legacy system, does not identify and withhold bills for labwork for which no signed physician order exists—even though it had control over a system that did so.

245.    As a result, DaVita regularly bills government payors for lab tests based on unsigned physician orders.

246.    In addition, DaVita regularly bills for tests that are not ordered by the patient's treating physician, in contravention of Medicare rules.

247.    DaVita's laboratory ordering system is set up in such a way that it often causes laboratory services to be performed multiple times, on an ongoing basis, even though the ordering physician only intended to order the test a single time.

248.    At times, particularly when monitoring a dialysis patient's non-ESRD conditions, a physician will want "one-off" labwork completed, *i.e.*, a one-time test that there is no medical reason to repeat.  DaVita's lab system, however, is designed to automatically treat all lab orders placed by physicians as "standing orders," meaning that they will be repeatedly conducted repeatedly at regular intervals until an order to stop them is placed.  Physicians frequently do not understand that this is the case.  Even if they do, DaVita intentionally set up its system to require additional steps for physicians to adjust the default settings to make their orders "one-off," rather

than repeating.  As a result, government payors are frequently billed for labwork for which no legitimate physician's order exists.

**D.     DaVita Rx Submits False Claims and Fails to Submit Refunds for Unused Prescriptions**

249.    DaVita Rx routinely submits false claims, and fails to submit required refunds, for prescriptions that the patient never needed and did not pick up.  This problem is largely a result of DaVita Rx's aggressive auto-refill program that is intentionally designed to make it nearly impossible for patients to disenroll.

250.    DaVita Rx automatically enrolls patients in the auto-refill program, regardless of a patient's need for the service, and it does not provide patients with an explanation of how to opt out of enrollment or unsubscribe once they are enrolled.  As a result, the auto-refill program causes DaVita Rx to regularly dispense unnecessary medications that patients either do not pick up or do not need—in many cases because the patients are deceased.  This, in turn, causes payors to submit false claims for reimbursement to Medicare.

251.    As noted above, Medicare rules require pharmacies to refund any payments from Medicare for erroneously dispensed prescriptions.  *See* CMS Prescription Drug Event Guidance for Post Point-of-Sale Claim Adjustments (July 3, 2013) (requiring Part D payors to recoup the cost of an erroneously dispensed drug from the dispensing pharmacy and to adjust the claim for payment from CMS accordingly).  Failure to provide such a refund is a violation of the False Claims Act.

252.    DaVita Rx regularly and knowingly fails to repay Medicare and other government payors when it erroneously dispenses drugs.

253.    DaVita Rx gives the individual clinics where the medications are dispensed little incentive to correct these problems.  To the contrary, the clinicians and other center staff are

411502.1

encouraged to aggressively pressure patients to join DaVita Rx—often while the patients are actively undergoing their dialysis treatment.

254.    DaVita nationally publishes monthly scorecards for each clinic that are intended to (and do) foster an environment of intense competition among clinics to increase DaVita Rx enrollments by their patients.  These scorecards form a central part of the monthly reviews of operating executives for each clinic, which ultimately determine the performance bonus for the head of the clinic.

255.    DaVita is fully aware of DaVita Rx's illegal actions.  In or around the spring of 2015, John Romer, the interim President of DaVita Rx, found that Josh Golomb, the outgoing President, had been overstating the company's financial performance.  DaVita CEO Kent Thiry learned of Mr. Romer's findings, and the company's Compliance department initiated an internal audit.  This review found several significant issues, including the fraudulent practices detailed above.

256.    The audit estimated that DaVita Rx should repay the Government $50 to $100 million.  Later, in a voice message dated October 6, 2015, Thiry informed Relator that the compliance problems within DaVita Rx led to a "total exposure" of approximately $20 to $60 million.  They identified this exposure because they knew that the Government would demand repayment of any funds that were paid out based on the fraudulent practices described above. However, it is Relator's understanding that DaVita voluntarily disclosed only $38 million in accruals to the HHS Office of the Inspector General to avoid having to pay back a higher amount.

411502.1

**E.      Billing for Medically Unnecessary Hospice Care**

257.     In March 2013, DaVita Medical Group acquired Las Vegas Solari Hospice Care, a hospice provider in Las Vegas, Nevada.

258.     As described above, hospice care is only available for terminally ill patients, i.e., those whose life expectancy is 6 months or less.  While owned by DaVita, Solari and its policies led to the admission of patients who stayed far beyond that anticipated maximum, producing an average stay as high as 200 days, meaning that the stays of numerous patients significantly exceeded that duration.

259.     In addition, Solari's discharge rate reached as high as 20% or more, indicating that many of these patients were not in fact terminally ill when they entered hospice care, as required by Medicare regulations.

260.     Solari's business was sustained by these fraudulent admissions of inappropriate patients.  The marketing department was known to tell referring physicians, "We'll take anyone."

261.     Further increasing illegitimate admissions, DMG also pressured its employed and affiliated physicians to refer patients to Solari.  DMG considered a physician's willingness to make such referrals when calculating physician bonuses.

262.     DaVita knew that Solari regularly billed for unnecessary hospice services. Indeed, DaVita and Solari's own internal audits have shown that admissions were frequently unsupported by appropriate medical documentation for long-term hospice care.

263.     As a result of these audits, DaVita temporarily brought Solari's admission standards into compliance with Medicare rules.  When the appropriate standards resulted in a reduced number of patients, however, DaVita reinstated the lower standards to keep patient counts, and thus revenue, as high as possible.

411502.1

264.     By admitting to Solari patients who are not terminally ill or who otherwise lack the requisite medical documentation, and subsequently seeking reimbursement for services rendered to these patients from government-funded healthcare programs, DMG has submitted false claims for payment in violation of the FCA.

265.     Additionally, after DMG acquired Solari Hospice in the spring of 2013, DaVita pursued the sellers for failing to disclose that Medicare was auditing Solari's admission practices at the time of the acquisition.  As a result, DaVita recovered some $16 million from Solari's prior owners.  DaVita, however, did not repay this amount to CMS, thereby violating the False Claim Act's reverse false claims provision.

266.     Ultimately, DMG sold Solari Hospice in September 2016.

**F.      Defendants' Actions Violate the False Claims Act**

267.     As alleged above, the Defendants' payments of kickbacks in exchange for referrals operate as improper inducements that violate the Anti-Kickback Statute or the Stark Law.  Any knowing submission of a claim for services resulting from a kickback-tainted referral is a false claim within the meaning of the FCA.  Defendants also submit or cause the submission of false claims within the meaning of the FCA when they submit claims for services knowing they are medically unnecessary or otherwise not compliant with CMS rules.

268.     The DaVita Defendants' provision of sweetheart deals on vascular access center joint ventures to high-referring nephrologists, in order to induce those nephrologists to continue referring their dialysis patients to DaVita, operates as an illegal kickback in violation of AKS.

269.     The DaVita Defendants' provision of rights of first refusal to Johns Hopkins, and the Defendants' subsequent repurchase of those rights, in exchange for dialysis referrals from Hopkins' nephrologists, likewise operate as illegal kickbacks in violation of AKS.  Defendants'

411502.1

payments also violate the Stark Law, as they induce Johns Hopkins physicians to refer their patients to DaVita to receive designated health services, such as lab work and prescription drugs.

270.     The DaVita Defendants also violate the AKS and the Stark Law by purchasing Fresenius-owned dialysis clinics and Fresenius-produced dialysis products to induce Fresenius to refer its dialysis patients to DaVita Rx—and subsequently seeking reimbursement from government payors for drugs obtained by these Fresenius-referred patients.

271.     Further, the DaVita Defendants' routine and deliberate waiver of co-pays without regard to patients' financial needs to induce those patients to continue to utilize DaVita's dialysis and prescription services—and to induce those patients' physicians to continue referring them to such services—also operates as an illegal kickback in violation of AKS.  To the extent that the illegally-induced referrals involved the purchase of prescription drugs, the kickbacks also violated the Stark Law.

272.     The MA Defendants also violate the AKS and the Stark Law by providing physicians with myriad inducements—including bonuses, enhanced capitation payments, free EHR systems, and the retention of revenues from false risk adjustment claims—to induce the physicians to bring their MA patients, and the patients' corresponding capitation payments, to the MA Defendants.

273.     Addtionally, the MA Defendants violate the FCA by knowingly submitting false risk adjustment claims through the Medicare Advantage Plans to CMS, based on their fraudulent upcoding, despite their attestations that they are following all applicable rules and only submitting supported diagnoses.

274.     Finally, the DaVita Defendants violate the FCA by knowingly submitting claims for lab services performed without valid physician orders; for unused prescriptions; and for medically unnecessary hospice care.

275.     These false claims, records, statements, and certifications were material to the Government's payments to Defendants.  The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.  Had the Government been aware, it would not have made payments on the claims and would have sought repayment of any such funds already paid.

411502.1

## COUNT I

### Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)–(C), (G)

276.    Relator realleges and incorporates by reference the allegations made in the preceding paragraphs.

277.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.,* as amended.

278.    By virtue of the acts described above, including on the bases of violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Law, 42 U.S.C. § 1395nn, Defendants, their agents, employees, and co-conspirators knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

279.    By virtue of the acts described above, including on the bases of violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Law, 42 U.S.C. § 1395nn, Defendants, their agents, employees, and co-conspirators knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

280.    By virtue of the acts described above, including on the bases of violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Law, 42 U.S.C. § 1395nn, Defendants, their agents, employees, and co-conspirators knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

411502.1

281.     By virtue of the acts described above, Defendants, their agents, employees, and co-conspirators conspired with various physicians, patients, competitors, and others to violate 31 U.S.C. §§ 3729(a)(1)(A)–(C) and (G), including on the bases of violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Law, 42 U.S.C. § 1395nn.

282.     These false claims, records, statements, and certifications were material to the government's payments to Defendants.  The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.  Had the Government been aware, it would not have made payments on the related claims and would have sought repayment of any such funds already paid.

283.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

284.     Additionally, the United States is entitled to the maximum penalty under 31 U.S.C. § 3729(a)(1), as adjusted for inflation, for each and every violation alleged herein.

## PRAYER

WHEREFORE, *Qui Tam* Plaintiff-Relator Dennis Kogod prays for judgment against Defendants as follows:

1. That Defendants cease and desist from violating the Anti-Kickback Statute, the Stark Law, and 31 U.S.C. §§ 3729 *et seq.*

2. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions in violation of the Federal False Claims Act, as well as the maximum allowable civil penalty for each violation of 31 U.S.C. § 3729;

3. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d); and

5. That the United States and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

411502.1

DATED: October 31, 2017        Respectfully submitted,

By:     */s/ Daniel M. Twetten*

Daniel M. Twetten
dan@loevy.com
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
Tel: (720) 583-6514
Colorado Bar Number: 44134

Eric Havian
ehavian@constantinecannon.com
Jessica Moore
jmoore@constantinecannon.com
Harry Litman
hlitman@constantinecannon.com
Leah Judge
ljudge@constantinecannon.com
CONSTANTINE CANNON LLP
150 California St., 16th Floor
San Francisco, CA 94111
Tel: (415) 639-4001

Michael Ronickher
mronickher@constantinecannon.com
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave. NW, Suite 1300N
Washington, DC 20004
Tel: (202) 204-3500

Attorneys for *Qui Tam* Plaintiff-
Relator Dennis Kogod

411502.1