## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA *ex rel.*
DENNIS  KOGOD,

Plaintiff,

v.                                                          Civil Action No. 17-cv-02611-PAB

DAVITA, INC., DAVITA RX, LLC, DVA
LABORATORY SERVICES, INC., d/b/a
DAVITA LABS, TOTAL RENAL
LABORATORIES, INC., RMS LIFELINE,
INC., d/b/a LIFELINE VASCULAR
ACCESS, REGAL MEDICAL GROUP, INC.,
and HERITAGE PROVIDER NETWORK,

Defendants.

## RELATOR'S MOTION AND MEMORANDUM OF LAW
## FOR ATTORNEYS' FEES, COSTS, AND EXPENSES

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 1

I.     NATURE OF THE ACTION ............................................................................ 1

II.    COUNSEL OF RECORD ................................................................................. 2

       A.    **Constantine Cannon**........................................................................ **2**

       B.    **Whistleblower Partners** ................................................................. **5**

III.   PROSECUTION OF THE ACTION .................................................................. 5

       A.    **Pre-Filing Investigation, Research and Complaint** ........................... **5**

       B.    **Fact Discovery, Further Counsel Investigation, and Collaboration with the
           Government**........................................................................................ **7**

IV.   FINAL SETTLEMENT .................................................................................... 9

V.    RELATOR'S ATTORNEYS' FEES, COSTS, AND EXPENSES................................. 11

       A.    **Attorneys' Fees**............................................................................ **11**

       B.    **Costs and Expenses** ..................................................................... **13**

ARGUMENT............................................................................................................. 13

I.     THE RELEVANT STANDARD ....................................................................... 13

II.    RELATOR IS ENTITLED TO HIS REQUESTED ATTORNEYS' FEES..................... 15

       A.    **Relator's Requested Attorneys' Fees Are Reasonable**....................... **15**

           1.    Counsel's Hourly Rates Are Reasonable ................................... 15

           2.    The Hours Counsel Worked Are Reasonable .......................... 19

       B.    **The Relevant Johnson Factors Further Underscore the Reasonableness of
           Relator's Attorneys' Fees**................................................................ **22**

           1.    Time and Labor Required ....................................................... 22

           2.    Novelty and Difficulty of the Case.......................................... 23

           3.    Level of Skill Required/Quality of Counsel ............................. 23

           4.    Preclusion of Other Employment............................................ 24

           5.    Contingent Nature of Fee ....................................................... 25

           6.    Quality of Results Obtained.................................................... 25

           7.    Awards in Similar Cases......................................................... 26

           8.    The Undesirability of the Case................................................ 27

       C.    **The Attorneys' Fees Incurred By DaVita Support the Reasonableness of
           Relator's Attorneys' Fees**................................................................ **28**

III.   RELATOR IS ENTITLED TO HIS REQUESTED COSTS AND EXPESNES ............ 28

i

IV.      RELATOR IS ENTITLED TO HIS FEES IN MAKING THIS MOTION ....................29

CONCLUSION.............................................................................................................29

CERTIFICATE OF SERVICE .................................................................................30

# TABLE OF AUTHORITIES

Page(s)

Cases

*Ad Astra Recovery Servs, Inc. v. Heath*, Case,
  No. 18-1145-JWB-ADM, 2020 WL 4346965 (D. Kan. July 29, 2020)............................................................ 19

*Brilliant Optical Sols. LLC v. Comcast Corp.*,
  No. 13–cv–00886–REB, 2015 WL 1476691 (D. Colo. Mar. 15, 2015) ...................................................... 14, 15

*Faulkner v. Ensign U. S. Drilling, Inc.*,
  No. 16-cv-03137-PAB-KLM, 2020 WL 550592 (D. Colo. Feb. 4, 2020)..............................................15, 25, 27

*Gudenkauf v. Stauffer Commc'ns, Inc.*,
  158 F.3d 1074 (10th Cir.1998)........................................................................................................................ 14

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ........................................................................................................................................ 14

*Homeward Bound, Inc. v. Hissom Mem'l Ctr.*,
  963 F.2d 1352 (10th Cir.1992)........................................................................................................................ 14

*In re Home Depot Inc.*,
  931 F.3d 1065 (11th Cir. 2019)....................................................................................................................... 28

*In re Visa Check/Mastermoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) .............................................................................................................. 3

*Indep. Living Ctr. ofS. Cal. v. Kent*,
  2:08-CV-03315-CAS(MANx),2020 WL 418947 (C.D. Cal. Jan. 24, 2020)...................................................... 19

*Moi v. Jenkins*,
  491 U.S. 274 (1989) ........................................................................................................................................ 16

*Johnson v. Ga. Highway Express, Inc.*,
  488 F.2d 714 (5th Cir.1974) .................................................................................................................... 14, 24

*Lucas v. Kmart Corp.*,
  No. 99–cv–01923–JLK–CBS, 2006 WL 2729260 (D. Colo. July 27, 2006) .................................................... 17

*Perez v. Rash Curtis & Assocs.*,
  2020 WL 1904533 (N.D. Cal. 2020) ............................................................................................................... 19

*Ramos v. Lamm*,
  713 F.2d 546 (10th Cir. 1983)................................................................................................................... 14, 16

*Shaw v. AAA Eng'g & Drafting, Inc.,*,
  213 F.3d 538 (10th Cir. 2000)................................................................................................................... 14, 29

*State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*,
   137 S. Ct. 436 (2016) ................................................................................................ 14

*Talone v. Am.Osteopathic Ass'n*,
   1:16-cv-04644-NLH-JS,2018 WL 6318371 (D.N.J. Dec. 3, 2018).................................... 19

*United States ex rel. Bahnsen v. Boston Sci. Neuromodulation Corp.*,
   No. 11-1210 , 2021 WL 118927 (D.N.J. Jan 1, 2021)....................................................... 19

*United States ex rel. Barbetta v. DaVita, Inc. et al.*, No. 09-cv-02175-WJM-KMT (D. Colo.). ................................. 4

*United States ex rel. Bisbanov. Claris Vision, LLC*,
   C.A. No. 18-00176-MSM, 2024 WL 2843063. (D.R.I. June 5, 2024) .............................. 16

*United States ex rel. Fallon v. Accudyne Corp.*,
   97 F.3d 937 (7th Cir. 1996) ......................................................................................... 17

*United States ex rel. Liotinev. CDW–Gov't, Inc.*,
   3:05-cv-00033-DRH-PMF,2013 WL 11267176., (S.D. Ill. May 17, 2013)........................ 16

*United States ex rel. Monticrieff  v. Peripheral Vascular Assocs.*,
   SA-17-CV-00317-XR, 2023 WL 10409922 (W.D. Tex. Aug. 1, 2023).................... 16, 23, 24

*United States ex rel. Rai v. KS2 TX, P.C.*,
   No. 3:17-cv-834(JBA), 2019 WL 1397290 (D. Conn. Mar. 27, 2019)........................ 17, 18

## Statutes

31 U.S.C. § 3703(d) ............................................................................................................ 1

31 U.S.C. § 3730 ................................................................................................................ 1

31 U.S.C. § 3730(d).................................................................................................... 14, 15

## Other Authorities

132 Cong. Rec. H9382-03 .................................................................................................. 31

1986 U.S.C.C.A.N. 5266 .................................................................................................... 15

5294.................................................................................................................................. 15

Manual for Complex Litigation § 14 ................................................................................... 34

Relator Dennis Kogod submits this brief, along with Counsel's contemporaneous time records, in support of Relator's motion for DaVita, Inc. ("DaVita") to pay Relator $14,112,953.03 in attorneys' fees and $523,534.78 in costs and expenses for Relator's successful prosecution of this case, which resulted in a $34,487,390 settlement with the Department of Justice ("DOJ").[1]

## INTRODUCTION

Relator is entitled to the reasonable attorneys' fees, costs and expenses incurred in successfully resolving this False Claims Act ("FCA") litigation. Under the FCA, private litigants with information about a fraud perpetrated against the government ("relators") can bring an action on behalf of themselves and the government. *See* 31 U.S.C. § 3730. Often, relators are "whistleblowers" who publicly denounce their former employers' fraud, and that is the case here. The federal *qui tam* statue explicitly requires defendants to pay a relator's reasonable fees, costs, and expenses. 31 U.S.C. § 3703(d). Relator's fees and costs were driven by the challenges and complexities of pursuing this lengthy litigation, the investigation of broad and wide-ranging fraud covering over a decade of conduct across multiple entities, the substantial assistance provided by Relator and his Counsel to the DOJ in combatting DaVita's health care fraud and abuse, the massive amount of documents from discovery, and the positive resolution of the case resulting in a multi-million-dollar settlement.

## STATEMENT OF FACTS

### I.   NATURE OF THE ACTION

Defendant DaVita is a for-profit, publicly traded Fortune 500 company headquartered in Denver, Colorado that provides kidney dialysis services through a network of close to 3,000

---

[1] The supporting declaration is from Michael Ronickher ("Ronickher Decl."). Counsel's contemporaneous time records for the hours billed to this matter are attached to the Ronickher Decl. as Exs. 1 and 2.

outpatient dialysis centers.  As of 2016, approximately 88% of DaVita's dialysis patients were covered under some form of government-based program.  DaVita has multiple present and former divisions and subsidiaries.  Pertinent here are its Kidney Care division, its Medical Group division, former subsidiary DaVita RX, LLC, which provided pharmacy services for dialysis patients, and former subsidiary Lifeline Vascular Access, which managed Vascular Access Centers ("VACs").  Ronickher Decl.  ¶¶ 8 -12.

Relator is an experienced, senior healthcare executive who worked at DaVita for 11 years, during which time he held offices of President and Chief Operating Officer for a number of different business divisions, including Chief Operating Officer of DaVita Kidney Care.  *Id.* ¶ 13.  Relator separated from the company in November 2016.  *Id.*  He filed his original Complaint in October 2017, alleging DaVita had engaged in a number of fraudulent schemes related to:  (i) its dealings with Fresenius Medical Group, one of its competitors in the dialysis and pharmacy markets; (ii) furnishing kickbacks to physician owners of Vascular Access Centers ("VACs"); (iii) improper and illegal kickbacks to physicians part of Johns Hopkins' nephrology practice; and (iv) engaged in a fraudulent scheme with respect to a Medicare Managed Care ("Medicare Advantage") program.  Dkt No 1.

## II.   COUNSEL OF RECORD

### A.   Constantine Cannon

Relator retained Constantine Cannon LLP ("C|C") in January 2016.  Ronickher Decl. ¶ 14.  C|C is an internationally recognized law firm with offices in New York, San Francisco, and Washington, DC, specializing in whistleblower and antitrust litigation and counseling.  Ronickher Decl. ¶ 136 - 142.  On the antitrust side, Constantine Cannon has recovered for its clients more than $5 billion in damages and tens of billions of dollars more in injunctive relief.  *Id.* ¶ 138.  This includes two of the five largest antitrust settlements in U.S. history.  *Id.*  In

connection with one of those cases, the presiding judge, the Honorable John Gleeson of the Eastern District of New York wrote that the firm was "a premiere plaintiffs' litigation firm" with "uniformly excellent" work product. *In re Visa Check/Mastermoney Antitrust Litig*., 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003).

C|C has been equally successful on the whistleblower side. Ronickher Decl. ¶ 139. The firm's whistleblower practice was recognized in 2020 by LexisNexis' Law360 as a "Practice Group of the Year," the first time the award was made to a whistleblower practice. *Id.* A year ago, C|C was part of a litigating team which procured the largest announced settlement in the history of the Illinois False Claims Act. *Id.* ¶ 141. The suit alleged that a number of Wall Street banks engaged in collusion and misrepresentations, resulting in inflation in the interest rates paid on municipal bonds, issued by public entities. *Id.* Its client, Johan Rosenberg, stated that he was "gratified by the settlement. My goal . . . was to shine a light on this market because of the benefit the public receives from the critical government projects that VRDOs fund." *Id.*

Also in 2023, the government reached a settlement with KBR on an FCA action filed by a C|C client. Ronickher Decl. ¶ 142. During the Iraq War, KBR contracted with the government to provide supplies and logistics. *Id.* C|C's client detailed how KBR mismanaged governmental funds and property, despite KBR's representations that it was implementing inventory controls to minimize excess and waste. *Id.* The settlement resulted in the government recouping nearly $109 million, the largest cash settlement related to the Iraq War and resulted in one of the ten largest whistleblower awards of that year. *Id.*

Several years ago, C|C represented a whistleblower who exposed a decade-long bid-rigging conspiracy by the five largest oil companies in South Korea. *Id.* ¶ 143. In September 2020, the defendants paid $163 million under the FCA plus another $200 million in fines and

penalties to settle the case. *Id.* When announcing the result, the U.S. Department of Justice celebrated that "these are the largest [Clayton Act] Section 4A settlements in American history."[2] The government also cited this case as the impetus for a new enforcement initiative, the Procurement Collusion Strike Force.[3] This was an interagency partnership of federal prosecutors, the FBI, and Defense Department and Postal Service Inspectors General.[4]

Eric Havian, senior counsel on this case, led a past action against DaVita entitled *United States ex rel. Barbetta v. DaVita, Inc. et al.*, No. 09-cv-02175-WJM-KMT (D. Colo.). Ronickher Decl. ¶ 15. In 2014, that case concluded with a historic settlement. *Id.* The government recovered for the public $350 million. *Id.* At the time this was the largest settlement in U.S. history exclusively involving kickbacks in the healthcare industry. *Id.* The settlement was announced by the DOJ and reported nationwide. *Id.* Prominent media covered the story, including the New York Times, Wall Street Journal, and Law 360. *Id.* Relator, a DaVita employee, knew of *Barbetta*'s historic conclusion. *Id.* Relator then retained Counsel so that his *own* kickback claims against DaVita would be litigated with the exact same expertise, passion, and skill, maximizing the recovery of the public's funds. *Id.*

C|C represented the Relator from January 2016 through March 2024, when the partners then responsible for the matter left C|C to form their own law firm, Whistleblower Partners. C|C has made a limited appearance in this forum to pursue Relator's attorneys' fees, costs, and expenses.

---

[2] https://www.justice.gov/opa/pr/doj-agrees-civil-settlement-additional-firm-involved-bid-rigging-and-fraud-targeting-defense
[3] https://www.justice.gov/opa/pr/justice-department-announces-procurement-collusion-strike-force-coordinated-national-response
[4] *Id.*

### B.      Whistleblower Partners

Whistleblower Partners LLP ("Whistleblower Partners") is a firm of dedicated whistleblower attorneys, founded in 2024 by several former partners of C|C.  Ronickher Decl. ¶ 144.  Whistleblower Partners attorneys have represented hundreds of whistleblowers who have led to billions of dollars in recoveries to the government.  *Id.*  Its clients have received hundreds of millions of dollars in whistleblower rewards under the FCA, the SEC Whistleblower Program, the IRS Whistleblower Program, and others.  *Id.*

Whistleblower Partners has represented the Relator from March 2024 to present.

* * *

For purposes of this petition, C|C and Whistleblower Partners shall be collectively referred to as "Counsel."

### III.     PROSECUTION OF THE ACTION

Counsel and Relator spent eight years prosecuting this case and helping bring it to its conclusion.  The time can be broken out into two main phases:  (i) pre-filing investigation, research, and drafting of the Complaint (January 2016 – October 2017); (ii) after Relator's witness interview by the DOJ in 2017, fact discovery, further investigation, and collaborating with the DOJ in developing the allegations in the Complaint, along with assistance negotiating the ultimate settlement agreement.  Ronickher Decl. ¶ 16.

### A.      Pre-Filing Investigation, Research and Complaint

After Relator retained C|C in January 2016, the firm spent 22 months investigating and drafting the Complaint and Disclosure Statement.  *Id.* ¶ 21.  This involved multiple meetings with Relator; collecting and analyzing the evidence; reviewing the extensive Medicare and

Medicaid regulations, history, and regulatory guidance; and researching the relevant case law and facts.  ¶¶ 21 - 31.  This was a considerable undertaking.

The illegal conduct alleged by the Complaint was long and wide.  The examined facts stretched back to 2005, predating the Complaint by 12 years.  *Id.* ¶ 23.  They involved a wide swath of actions and strategies.  *Id.* ¶ 21 - 31.  There were multiple allegations of DaVita coordinating illegal actions with Fresenius Medical Corporation ("FMC"), its largest competitor in the dialysis market.  *Id.* ¶ 25.  DaVita and FMC were alleged to have colluded to mask the prices of drugs sold by FMC to DaVita which DaVita then sold to the government.  *Id.* Separately, FMC had European dialysis clinics which had come under the scrutiny of European competition regulators.  *Id.*  DaVita assisted FMC by purchasing the problematic centers.  *Id.* Counsel believed, and investigated, that DaVita had overpaid for these clinics as a surreptitious kickback so that FMC would refer its patients to DaVita centers.  *Id.* ¶ 74.  For physicians, the Complaint alleged that DaVita provided kickbacks in the form of subsidizing VACs.  *Id.* ¶ 24. These VACs are owned by the physicians who operate them.  *Id.*  DaVita, through its Lifeline division, provided management services to these VACs in exchange for the levying of a management fee.  *Id.*  Certain of the physicians were positioned to refer patients to DaVita's own dialysis centers.  *Id.*  Counsel alleged, that again as a concealed kickback, DaVita would fail to collect the management fees which it was owed to induce those physicians to refer their patients to DaVita's own dialysis centers, in contravention of federal law and the public interest.  *Id.* Finally, the Complaint alleged that DaVita, fearful that it would lose patient referrals from Johns Hopkins University School of Medicine ("Hopkins"), in its contract with Hopkins, granted the Hopkins physicians the Right of First Refusal of taking the position of the medical director of

any newly constructed DaVita dialysis facilities.  *Id.* ¶ 26.  This grant of rights even went beyond the geographic market which Hopkins served.  *Id.*

These allegations, in totality, touched upon multiple federal regulations and DaVita divisions and subsidiaries.  Developing and bringing Relator's Complaint and Disclosure Statement to completion required many discussions with Relator, an examination of the evidence which he possessed, researching information available from public sources, and extensive legal and regulatory research.

### B.   Fact Discovery, Further Counsel Investigation, and Collaboration with the Government

After Relator filed his Complaint in October 2017, Counsel began working closely with the DOJ.  Ronickher Decl. ¶ 32.  Two months after the filing of the Complaint, the DOJ interviewed Relator for the first time, on December 20, 2017.  *Id.* ¶ 33.  Subsequent interviews would follow in March 2018 and February 2021.  *Id.*

Since the end of 2017 Counsel has supported the government in bringing this case to resolution.  *Id.*  ¶¶ 32 - 85.  And over this span, Counsel had regular conversations with the DOJ and much of the work performed was at the direct request of the DOJ or to provide the DOJ a factual understanding of the claims.  *Id.* ¶ 32.  In addition to Relator's interviews with the DOJ, Counsel met with the DOJ separately, had at least 90 calls and teleconferences with the DOJ, and an uncountable number of e-mail exchanges.  *Id.* ¶ 36.  The number of projects and investigations undertaken were many.  *Id.* ¶¶ 32 - 85.  Counsel supported the DOJ in preparing the initial Civil Investigate Demand served on DaVita, defining and drafting its subsequent investigatory requests, selecting the appropriate employees to interview and collect documents appropriate to be used in them, later identifying gaps in the discovery for further requests, and performing numerous investigations of fact and law as requested.  *Id.* ¶¶ 37 - 84.  Counsel

drafted and provided to the DOJ a number of legal memoranda and, ultimately, in January 2023 a detailed 142-slide presentation on the VACs allegations which was the culmination of the years of investigation which Counsel had done on the topic.  *Id.* ¶¶ 40, 65, 68.

The nature of the claims required a close and fine combed examination of the records. The substance of the allegations was that DaVita passed excess value to its business partners and concealed them within non-direct payments.  *Id.* ¶¶ 24 - 27.  Intrinsically, they were not amendable to an easy discovery.  The proof of the allegations rested on an accurate and thorough valuation of those contracts and attendant financials, drilling into the values promised and the values extracted.  *Id.* ¶¶ 42, 58,73.  Counsel's investigation was necessarily and correspondingly so detailed.  Particularly on the VACs, Counsel identified and catalogued the relevant centers. *Id.* ¶ 62.  It then poured through the documents produced in discovery to identify all of the agreements which RMS Lifeline, a DaVita wholly owned subsidiary, made with the centers.  *Id.* And then for a number of exemplars, did a detailed look at the centers' history, operational details, and financials to determine the centers' underlying costs and amounts owed to DaVita. *Id*. ¶¶ 55 - 56.  Counsel then sought to identify any proof of underpayments from the VACs to DaVita for money owed in interest and management fees to support the allegation of value transfer.  *Id.* ¶ 58.  Similarly, a detailed examination of facts and financials was required in investigating the claim of DaVita's overpayment while purchasing FMC's European centers.  *Id.* ¶ 74.

The fundamental building blocks for these analyses came from a review of documents produced in the investigation and others which Relator provided to Counsel.  *Id.* ¶ 50.  The production document repository eventually contained millions of pages to sift through.  *Id.* ¶ 16. Much of Counsel's review of these was done by targeted searches, focusing on topics and

custodians of relevance to the particular question at hand.  *Id.* ¶¶ 50 - 51.  Counsel also performed linear reviews when so requested by the DOJ.  *Id.* ¶ 60.

This process was collaborative and iterative.  Counsel would perform diligence and investigation, many times at the direction of DOJ.  Counsel and the DOJ would meet and discuss Counsel's findings.  And then Counsel would perform follow-up diligence, when requested, on any new questions presented by the findings.  While some of the projects, such as the examination of the VACs, stretched on for months, building, cataloguing, and melding the disparate facts into cohesive narratives and findings.  *Id.* ¶¶ 32 - 85.

When the government and DaVita approached a settlement in principle in 2024, Counsel reviewed and negotiated language in the settlement agreement among the three parties. Counsel additionally worked on the filings necessary to conclude the matter with the Court.

There were no other law firms assisting Counsel in this effort.  In its assistance to the DOJ, Counsel prosecuted this matter entirely with its own staff and hand-selected, experienced contract attorneys.  *Id.* ¶ 39.  Nearly all of the professionals on the case had prior experience in whistleblower actions, some by a number of decades.  *Id.* ¶¶ 146 - 177.  This ensured that the hours spent were spent efficiently, entering with specialized knowledge of the subject area.  *Id*. ¶ 93.  And with no promise of ever being compensated for its time, expenses, and efforts, Counsel had every incentive to hold the time and expenses spent to only the necessary and productive. The number of hours expended spoke to the enormity of the task and Counsel's dedication to providing correct and thorough analyses rather than any inefficiencies of Counsel.

## IV.     FINAL SETTLEMENT

In May of 2024, the government entered a final Settlement Agreement with DaVita wherein DaVita agreed to pay the government $34,487,390.  *Id.* ¶ 86.  When announcing the

settlement, Matthew Kirsch, Acting U.S. Attorney for the District of Colorado, said, "Medicare patients should be able to trust their healthcare providers not to pay illegal kickbacks to induce referrals. This resolution reflects the seriousness of the government's determination to restore integrity to the healthcare marketplace."[5]  Linda Hanley, Special Agent in Charge from the Department of Health and Human Services Office of Inspector General, added, "Illegal kickback payments corrupt the market for health care services and cause harm and financial loss to Medicare and other federally funded health care programs."[6]  In recognition of this result, the government awarded Relator 18% of the Settlement amount.[7]  The Settlement caught the attention of the press and industry publications, including the Denver Post, Colorado Public Radio, the National Law Review, Fierce Healthcare, and Healthcare Finance.[8]  The amount recovered by the government is substantial, and the impact of this matter goes beyond the public recoupment of these millions of dollars. It potentially saves the government from being defrauded in the future. As the National Law Review stated, "This settlement serves as a critical reminder for healthcare professionals and organizations about the importance of compliance with the False Claims Act and the Anti-Kickback Statute. Engaging in practices that involve kickbacks, even indirectly, can lead to severe legal consequences, including substantial financial penalties and damage to reputation."[9]

---

[5] https://www.justice.gov/opa/pr/davita-pay-over-34m-resolve-allegations-illegal-kickbacks
[6] *Id*.
[7] *Id*.
[8] https://www.denverpost.com/2024/07/19/davita-kickback-settlement-department-justice/;
https://www.cpr.org/2024/07/18/dialysis-company-davita-settles-lawsuit-anti-kickback-laws/;
https://natlawreview.com/article/dialysis-and-deceptiveness-whistleblower-earns-637-million-reporting-unlawful;
https://www.fiercehealthcare.com/providers/doj-davita-pay-34-million-settle-kickback-allegations;
https://www.healthcarefinancenews.com/news/davita-paying-34-million-over-kickback-allegations
[9] https://natlawreview.com/article/dialysis-and-deceptiveness-whistleblower-earns-637-million-reporting-unlawful

## V.       RELATOR'S ATTORNEYS' FEES, COSTS, AND EXPENSES

Due to the wide-ranging nature of the fraud and multiple kickback and corruption schemes alleged in this matter, the investigation of these False Claims Act claims was particularly onerous. The case settled after Counsel spent: (i) 30,523.5 hours in attorney and legal support time for a total lodestar of $14,537,240.00, based on Counsel's 2024 hourly rates; and (ii) $523,534.78 in hard costs and expenses.[10]  But for the efficient manner in which Counsel staffed and prosecuted this action, these figures would have been substantially higher.

### A.       Attorneys' Fees

Counsel staffed this case with attorneys with a wide range of experience.  Counsel included a former Assistant U.S. Attorney for the Northern District of California to experienced staff and contract attorneys.  *Id.* ¶¶ 146 - 177.  By incorporating such a wide range of seniority into the litigating team, Counsel was able to hold down the costs considerably, often assigning tasks to staff which would be performed elsewhere by more senior, and much more expensive, attorneys.  *Id.* ¶ 93.  The hourly rates for these attorneys and staff, their position, when they joined the case, when they left the case, the hours they billed, and their lodestars are as follows:

| Table 1: Experience, Rates, and Lodestar of Counsel's Staff | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Name** | **Position** | **Years of Exp.** | **Joined Case** | **Left Case** | **Hourly Rate** | **Hours** | **Lodestar** |
| Michael Ronickher[*] | Of Counsel, promoted to Partner | 16 | 6/1/2017 | Current | $750 (Of Counsel) / $1,050 (Partner) | 1,365.80 | $1,225,238 |

---

[10] Despite Counsel's lodestar, it is only seeking $14,112,953.03 in attorneys' fees in this petition.  In 2018, Counsel and DaVita agreed to a partial settlement of Counsel's fees when DaVita settled the Medicare Part C portions of this case.  At that time, Counsel and DaVita agreed that if Counsel were to prevail on other claims covered by those fees, it would only seek payment on the remaining portion of the fees which DaVita had not already settled.  Consequently, Counsel has reduced its petitioned fees here by $424,292.97 in accordance with that agreement.  Ronickher Decl. ¶¶ 90 - 91.

| | | | | in July 2019 | | | |
|---|---|---|---|---|---|---|---|
| Erik Havian* | Partner | 43 | 2/4/2016 | Current | $1,400 | 197.5 | $276,500 |
| Harry Litman | Of Counsel | 38 | 1/20/2016 | 6/16/2018 | $1,400 | 275.3 | $385,350 |
| Tim McCormack | Partner | 23 | 2/4/2016 | 10/14/2017 | $1,120 | 199.8 | $223,720 |
| Jessica Moore | Partner | 29 | 1/14/2016 | 7/15/2021 | $1,120 | 604 | $676,480 |
| Hamsa Mahendranathan* | Associate, promoted to Partner in November 2021 | 12 | 1/15/2020 | Current | $640-$675 (Associate) / $850 (Partner) | 890.5 | $697,569 |
| Molly Knobler | Of Counsel | 13 | 7/11/2016 | 9/21/2017 | $750 | 218 | $163,500 |
| Leah Judge | Associate | 10 | 7/11/2016 | 1/11/2023 | $500-$675 | 1,880.50 | $1,135,289 |
| Noelle Lasso | Associate | 8 | 7/31/2018 | 12/13/2019 | $500-$530 | 525.3 | $299,105 |
| Noah Brecker-Redd | Associate | 3 | 10/19/2021 | 1/12/2023 | $480-$500 | 836.3 | $417,200 |
| Ginger Buck | Staff Attorney | 19 | 10/15/2018 | 2/17/2023 | $480 | 5,058.30 | $2,427,960 |
| Ronny Valdes | Staff Attorney | 9 | 8/8/2016 | 7/25/2023 | $480 | 5,673.50 | $2,723,280 |
| Matthew Koenig | Staff Attorney | 27 | 4/11/2022 | 11/30/2022 | $480 | 615.3 | $295,320 |
| Audrey Tobacco | Staff Attorney | 15 | 12/2/2021 | 7/14/2022 | $480 | 93 | $44,640 |
| Shari Newman | Contact Attorney | 18 | 4/24/2019 | 6/29/2023 | $290 | 9,833.80 | $2,851,788 |
| Rebecca Santos-Trioche | Contact Attorney | 18 | 1/20/2022 | 7/24/2022 | $290 | 1,074.00 | $311,460 |
| Emile Barton | Contact Attorney | 20 | 1/20/2022 | 8/14/2022 | $290 | 898 | $260,420 |
| Janice LeBon | Paralegal | 24 | 11/14/2016 | 1/9/2018 | $405 | 177.3 | $71,786 |
| Janice Kelly | Librarian | 36 | 8/3/2016 | 11/7/2022 | $470 | 107.8 | $50,643 |

* Rates given for Hamsa Mahendranathan are her rates for her time at Constantine Cannon. Beginning on March 16, 2024, her applied rate is for her rate as billed by Whistleblower Partners of $900. The rates for Eric Havian and Michael Ronickher at Whistleblower Partners are the same as they were at Constantine Cannon.

The distribution of these hours reinforces how efficiently Counsel staffed the case. Nearly all the hours, 93%, were by associates, counsel, staff attorneys, contract attorneys, and other staff. *Id.* ¶ 109. Only 7% were by partners. *Id.* This distribution of hours flows from how carefully Counsel allocated the various litigation tasks, using the most cost-efficient lawyers whenever and wherever possible.

### B. Costs and Expenses

Counsel incurred $523,534.78 in costs and expenses. The majority of those costs were for the retaining of PYA, a national leader in auditing health care systems. *Id.* ¶ 117. PYA was necessary to evaluate the allegations: to value and account for the clandestine ways in which DaVita transferred value to other parties. *Id.* ¶ 135. The second largest expense was for outside filter counsel to review documents in Relator's possession prior to their examination by Counsel to avoid potential privilege issues. *Id.* ¶¶ 127, 134. The remainder were for standard, modern litigation costs such as digital forensic analyses to extract electronic files, computerized legal research, document and data hosting, and travel and logistical incidentals. *Id.* ¶ 116.

*     *     *

The detailed records supporting these attorneys' fees, costs, and expenses are attached as Ronickher Decl., Exs. 1-3.

**ARGUMENT**

## I. THE RELEVANT STANDARD

The FCA is designed to encourage whistleblowers to step forward and supplement the government's limited resources to combat fraud. The federal statute does that in two ways. It provides whistleblowers a share in any government recovery. 31 U.S.C. § 3730(d). And it requires defendants to pay successful whistleblowers their reasonable attorneys' fees, costs, and

expenses.  *Id.*[11]  The fee-shifting provision is especially important because it allows whistleblowers, typically individuals with limited resources, to retain competent counsel to pursue hard-fought, complex litigation against well-represented companies.[12]  This is exactly the case here with Relator, an individual, suing a Fortune 500 company represented by Sidley Austin and Hogan Lovells.

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."[13] This is known as the lodestar amount.[14]  The party seeking the fees has the initial burden of establishing the reasonableness of the requested fees through contemporaneous time records. The burden then shifts to the opposing party to establish why the requested fees are not supported and what lesser amount is warranted.[15]

There is a strong presumption in this Circuit that the lodestar fee represents a reasonable fee for purposes of fee-shifting statutes.  *Homeward Bound, Inc. v. Hissom Mem'l Ctr.,* 963 F.2d 1352, 1355 (10th Cir.1992).  However, in determining reasonable attorney fee awards, the court may adjust the lodestar amount based on the factors articulated by the United States Court of Appeals for the Fifth Circuit in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 718-19 (5th Cir.1974), to the extent those factors are relevant.  *See Gudenkauf v. Stauffer Commc'ns, Inc.,*

---

[11] When Congress added the mandatory fee-shifting provision, it stressed the critical role whistleblowers play in FCA enforcement. *See State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 137 S. Ct. 436, 443 (2016) (FCA reforms were to "encourage more private enforcement").

[12] Sen. Rep. 99-345 at 29 (1986) *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5294 (highlighting importance of fee-shifting provisions because "[u]navailability of attorneys' fees inhibits and precludes many private individuals, as well as their attorneys, from bringing civil fraud suits") (internal quotation marks and citation omitted); *see also Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 538, 544 (10th Cir. 2000) (noting same).

[13] *Ramos v. Lamm*, 713 F.2d 546, 552 (10th Cir. 1983) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

[14] *Brilliant Optical Sols. LLC v. Comcast Corp.*, No. 13–cv–00886–REB, 2015 WL 1476691, at *3 (D. Colo. Mar. 15, 2015).

[15] *See Hensley*, 461 U.S. at 437 ("fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates").

158 F.3d 1074, 1083 (10th Cir.1998); *Faulkner v. Ensign U. S. Drilling, Inc.,* No. 16-cv-03137-PAB-KLM, 2020 WL 550592, at *3-7 (D. Colo. Feb. 4, 2020) (Brimmer, J.) (applying *Johnson* factors in fee-shifting case but noting that "a court need specifically address only relevant *Johnson* factors") (citation omitted).  These factors include:  (i) time and labor required; (ii) novelty and difficulty of the case; (iii) level of skill required; (iv) preclusion of other employment; (v) attorney's customary hourly rate; (vi) contingent nature of fee; (vii) time limitations imposed; (viii) results obtained; (ix) experience, reputation, and ability of the attorneys; (x) "undesirability" of the case; (xi) nature and length of the professional relationship with the client; and (xii) awards in similar cases.[16]  For the reasons set forth below and in the accompanying declaration, the factors relevant in this case strongly support the award of Relator's attorneys' fees, costs, and expenses.

## II.    RELATOR IS ENTITLED TO HIS REQUESTED ATTORNEYS' FEES

Relator is seeking payment for a total attorneys' fee lodestar of $14,537,246.  This amount is reasonable based on Counsel's hourly rates and the hours Counsel worked to secure this result.  These fees are further supported by each of the *Johnson* factors, especially the time and labor required, the quality of the lawyering, the undesirability of the case, and fee awards made in comparable cases.

### A.    Relator's Requested Attorneys' Fees Are Reasonable

#### 1.    Counsel's Hourly Rates Are Reasonable

Reasonable hourly rates are generally defined as "the prevailing market rate in the community in question for an attorney of similar experience."  *Brilliant Optical Solus.*  2015 WL 1476691, at *3.  And they are based on current rates to compensate for the delayed payment for

---

[16] *See Faulkner,* 2020 WL 550592, at *3 (citing factors) (internal citations omitted).

work performed over the course of what can be very lengthy litigation, like this one.  *See Moi v. Jenkins*, 491 U.S. 274, 284 (1989) (finding proper "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise"); *Ramos*, 713 F.2d at 555 ("The hourly rate at which compensation is awarded should reflect rates in effect at the time the fee is being established by the court, rather than those in effect at the time the services were performed.").

Yet in some cases, as here, it is proper for Counsel to receive its own, out-of-district rates rather than the prevailing market rate of the community.  There are a number of bases for this.

*First*, some courts have recognized that litigation involving the FCA is a national, not local, practice.  *See United States ex rel. Monticrieff  v. Peripheral Vascular Assocs.*, SA-17-CV-00317-XR, 2023 WL 10409922 at *4 (W.D. Tex. Aug. 1, 2023)  In *Peripheral Vascular Assocs.*, the court found that the FCA is a "specialized area of the law" and that because there was a only small pool of attorneys in the local market who specialized in the area, "national awards may properly be considered."  *Id.*  Other courts have stated that "False Claims Act litigation is a very specialized area of practice" which is a "nationwide practice" and that a national market could be considered as the relevant community for reasonableness.  *United States ex rel. Liotine v. CDW–Gov't, Inc.*, No.: 3:05-cv-00033-DRH-PMF, 2013 WL 11267176 at *5., (S.D. Ill. May 17, 2013).  Indeed, in making a reasonableness determination in an FCA case, the District of Rhode Island approved the use of baseline rates awarded in other FCA actions, rather than rates local to the district.  *See United States ex rel. Bisbanov. Claris Vision, LLC,* C.A. No. 18-00176-MSM, 2024 WL 2843063 at *2. (D.R.I. June 5, 2024).

Moreover, as this Court itself has recognized in a past class action, where a case requires significant resources and skills, and entails risks, the universe of attorneys willing to litigate

16

those cases are few. *Lucas v. Kmart Corp.*, No. 99–cv–01923–JLK–CBS, 2006 WL 2729260, at

*4 (D. Colo. July 27, 2006). In those instances, "the relevant community for purposes of

determining a reasonable billing rate . . . consists of attorneys who litigate nationwide." *Id.*

    *Second*, courts have held that when considering the reasonableness of the attorney rates,

it is instructive to consider the defendant's selection of opposing counsel. *See United States ex*

*rel. Fallon v. Accudyne Corp.,* 97 F.3d 937, 941 (7th Cir. 1996). As Judge Easterbrook observed

in upholding a district court's award of a fee petition in an FCA case:

> This was a big-stakes case with potentially difficult legal and factual issues.
> [Defendant] hired a large and expensive law firm from Chicago; it can't
> grouse that the relators also engaged out-of-town commercial litigators whose
> hourly rates are normal for commercial cases. People spending their own
> money do this; the practice passes the market test that governs awards of
> statutory fees.

*Id.*; s*ee, also, United States ex rel. Rai v. KS2 TX, P.C.,* No. 3:17-cv-834(JBA), 2019 WL

1397290, at *5 (D. Conn. Mar. 27, 2019) ("[N]o party, whether relator or defendant, was

represented solely by counsel from within this District . . . providing further indication that a

reasonable, paying client would be likely to hire national counsel to investigate and litigate this

case."). And so it is here. DaVita reached out of Denver to pluck well-heeled counsel from

Chicago. Likewise, Relator agreed with DaVita's conclusion that sophisticated, out-of-district

attorneys were required.

    *Third*, Counsel was singularly positioned to litigate this case. Eric Havian, the senior

partner on the case, and still active today, had previously litigated *Barbetta*, discussed *supra*.

While there may be other FCA practitioners in the Denver local area, to litigate *this case*

involving *these allegations* against *this defendant*, Counsel was uniquely qualified and

experienced, which is why Relator retained this specific counsel. Not only was Relator being

reasonable in his selection of Counsel to litigate a kickback action against DaVita, it is arguably

true that Counsel was the *most* reasonable and prudent choice which Relator could have selected. In the FCA action of *United States ex rel. Rai.*, the court was satisfied that, "a reasonable client would likely understand the importance of securing highly experienced counsel to investigate and litigate this case, whether or not such counsel could be found within this District or willing to work at the lower hourly rates standard to this District."[17]

Here, Counsel's rates fall well within this standard for reasonable considering both blended and individual rates. When considered from an individual rate perspective, as demonstrated above, there are multiple reasonable foundations and precedent for Relator to have selected out-of-district representation. And as part and parcel, it is accordingly reasonable for Counsel to receive its standard and actual rates used in all of its matters. Here particularly, as Judge Easterbrook noted, by spending its own money DaVita has set the market, in the most reliable way possible. When making its decision which mattered, and which reflected its own actual best judgment, DaVita determined that the most appropriate rates for this matter were those of its own counsels, Sidley Austin and Hogan Lovells. This is the reasonable market rate which DaVita has set. Counsel's rates are eminently reasonable by that market standard, being substantially lower than DaVita's own counsel. Ronickher Decl. ¶ 105, Table 1.

Looking at Counsel's blended rates, Counsel's rates are also eminently reasonable. Counsel's blended hourly rates were $476.26 for all timekeepers on the case. Ronickher Decl. ¶ 103. These blended rates fall in line with or well below the rates charted by other firms in similarly (or less) complex matters for attorneys of similar (or less) skill and experience. This is especially apparent from the numerous class action settlements where the plaintiff's counsel had

---

[17] *Rai,* 2019 WL 1397290 at 5.

overall blended hourly rates well in excess of the $476 blended rate here.[18]  Even more importantly, the blended rates of this case are in line with those that Counsel has billed *and recovered* in other large, complex litigations.  Ronickher Decl. ¶ 104.

The hourly rates of the core legal team are equally reasonably when considered on an individual basis and in light of the background and experience:  *See* Table 1, *supra*.

These are the same rates Counsel bills for these attorneys for all firm matters.  Ronickher Decl. ¶ 105.  They are in line with customary rates both firms (C|C and WP) bill *and get paid* in other matters, whether contingent or straight client-billed work.  *Id.* ¶¶ 102 - 106.  Indeed, four years ago Counsel received similar rates as is being requested here for 2 of the same attorneys.  *Id.* ¶ 102.  For Ms. Mahendranathan, Counsel received essentially the same rate, differing only by the application of Counsel's 2024 rate versus the ones which it charged in 2020.  *Id.*  For Ms. Newman, Counsel received the *exact* rate which it is now requesting four years later.  *Id.*  The court deemed all of Counsel's submitted rates appropriate and applied them accordingly.  *Id.*

## 2.    *The Hours Counsel Worked Are Reasonable*

By any measure – and supported by Counsel's time records – the total hours Counsel worked on this case was reasonable.  From January 2016 through the fall of 2023, Counsel prosecuted this case with dedication and diligence.  *Id.* ¶¶ 42 - 43, 47 - 48, 55 - 58, 62, 65, 68 - 74, 101.  It painstakingly undertook multiple lines of inquiry, encompassing DaVita's dealings with a number of other parties and touching upon disparate sections of substantive law.  *Id.* ¶¶ 21

---

[18] *See, e.g., Ad Astra Recovery Servs, Inc. v. Heath*, Case No. 18-1145-JWB-ADM, 2020 WL 4346965, at *8 (D. Kan. July 29, 2020) (**$500** blended hourly rate); *United States ex rel. Bahnsen v. Boston Sci. Neuromodulation Corp.*, No. 11-1210 , 2021 WL 118927, at *3 (D.N.J. Jan 1, 2021) (**$618** overall blended hourly rate); *Her v. Saul*, No. 1:18-cv-01218-SKO 2020, WL 5702133, at *3 (E.D. Cal. Sept. 24, 2020) (**$797** blended rate); *Perez v. Rash Curtis & Assocs.*, 2020 WL 1904533, at *19-20 (N.D. Cal. 2020) (**$634** blended rate); *Indep. Living Ctr. of S. Cal. v. Kent*, No. 2:08-CV-03315-CAS(MANx),  2020 WL 418947, at *12 (C.D. Cal. Jan. 24, 2020) (**$628** blended rate); *Talone v. Am. Osteopathic Ass'n*, 1:16-cv-04644-NLH-JS, 2018 WL 6318371, at *17 (D.N.J. Dec. 3, 2018) (**$601** blended rate).

- 29, 44 - 84.  It did so while opposing a multi-billion-dollar corporation, defended by preeminent law firms and counsel who also had depth of experience in *qui tam* actions and are nationally recognized as being among the best in the field.  *Id*. ¶¶ 8, 19.

The distribution of the hours spent supports the focus and reasonability of the endeavor.  The preliminary theories, and different bases, for an action against DaVita were explored in the period leading up to the filing of the Complaint and the Disclosure Statement.  *Id*. ¶¶ 21 - 23, 28, 93, 100, 109.  That period saw a lighter load of hours, staffed by attorneys with decades of experience in the area.  *Id*. ¶¶ 93, 100, 109, Table 6.  The post-Complaint period, on the other hand, grew more predominately factual investigation.  *Id*. ¶¶ 100, 109 - 110.  It saw a necessarily heavier load of hours but they were carried by junior attorneys at the firm.  *Id*. ¶¶ 100, 109, Table 6.

Counsel's billing brings this into a sharp focus.  Counsel spent 30,523 hours over 8 years prosecuting and settling this action.[19]  Ronickher Decl. ¶ 89.  Of those total hours, only 2,194 hours, 7.2% were performed and billed for by partners.  *Id.* Table 5.  Associates and Of Counsel billed 4,798.7 of the hours, comprising 15.7% of the total.  *Id.*  Counsel's junior attorneys: staff attorneys and contract attorneys, make up 23,245.8 hours, 76.2% of the total.  *Id.*  Lastly, non-legal staff accounted for 285 hours, 0.9% of the total.  *Id.*  The chart below displays how Counsel shifted the seniority and composition of its staff as the needs of the matter shifted themselves.[20]

---

[20] Although Mr. Litman's association with C|C was Of Counsel, his time in this chart is included in the totals for those of Partners, reflecting his wealth of experience and seniority.  Ronickher Decl., Table 6.



The factual development was considerable. The document universe was comprised of millions of pages responsive to the government's requests, additional documents which Counsel obtained from Relator, and publicly available documents such as Davita's filings with the SEC which Counsel utilized in its analyses. Id. ¶¶16, 22, 32, 41.  To arrive at that discovery, Counsel assisted the DOJ in a number of ways, including but not limited to, the following.  Counsel drafted proposed Civil Investigate Demands for the Government.  *Id.* ¶¶ 39, 45, 64.  Counsel suggested suitable follow-up investigatory requests, and proposed search terms and custodians to the DOJ.  *Id.* ¶¶ 37, 46, 79.  Counsel and Relator provided input on which witnesses the DOJ should interview.  *Id.* ¶¶ 37, 41.  Once those witnesses were selected, Counsel explored the productions for the most relevant documents to be used at those interviews.  *Id.* ¶¶ 37, 39, 61, 63,72.  And then Counsel drafted proposed witness kits and outlines to be used with the witnesses.  *Id.* ¶ 72. All the while, Counsel delved into the factual record to assemble the

detailed analyses and narratives necessary to properly understand and resolve the at-issue allegations.  *Id.* ¶¶ 32 - 84.

**B.      The Relevant Johnson Factors Further Underscore the Reasonableness of Relator's Attorneys' Fees**

Given this demonstrated reasonableness of Counsel's hourly rates and hours, DaVita has the burden of showing they are not reasonable.  DaVita cannot satisfy this burden as the *Johnson* factors relevant to this case powerfully supports their reasonableness and the resulting lodestar derived therefrom.

### 1.      Time and Labor Required

Counsel performed an exhaustive amount of work on this matter over the course of eight years.  As discussed above, Counsel diligently prosecuted this matter, first by investigating the issues of fact and law to draft the Complaint and Disclosure Statement.  Then subsequently Counsel conducted a thorough finding and synthesis of the facts and law.  Then, as the government neared a settlement in principle, Counsel assisted in bringing the matter to conclusion.  All work performed over this period was at the request of the DOJ or to support the DOJ's evaluation and prosecution of the matter.

Counsel spent in excess of 30,000 hours over the course of those 8 years.  Those hours shall increase due to the time spent drafting and filing this petition and its accompanying exhibits.  Those hours shall be ascertained and quantified in Counsel's Reply Brief to this motion.

C|C and WP maintain contemporaneous records for the work performed by all attorneys and staff.  All time is overseen and contemporaneously approved by attorneys contemporaneously active on the matter with knowledge and supervision of the timekeeper.  All timekeeper hours, rates, and lodestars are discussed and detailed *supra*.

2.      *Novelty and Difficulty of the Case*

This case presented a set of unique challenges that underscores the reasonableness of Relator's attorneys' fees.  First was the subject matter – multiple novel and complicated kickback arrangements by a major multinational dialysis and healthcare provider.  FCA health care cases are inherently challenging because of the myriad rules and regulations that govern Medicare/Medicaid participation and payment.  Aside from the difficult subject matter, the other major challenge was the wide breadth of conduct and documentation required to conduct a thorough investigation.  Counsel supported the Government throughout its rigorous investigation of these complicated claims.

3.      *Level of Skill Required/Quality of Counsel*

FCA cases are generally considered a "specialized area of the law."  *Peripheral Vascular Assoc.*  2023 WL 10409922 at *4.  To defend the action, DaVita retained Sidley Austin and Hogan Lovells, among the largest and most highly regarded corporate law firms in the country and nationally recognized in *qui tam* actions.  The action required a commitment of years and an outlay of hundreds of thousands of dollars, with no guarantee of Counsel ever recovering on either.  Given these unique challenges, the case required a firm with substantial FCA experience and a successful track record of taking on large, complicated, contentious litigation of this sort. C|C, which initiated the action, was one of the limited number of firms with the history and capability necessary to successfully take on DaVita and its law firms in this case.

As detailed in the Ronickher Declaration, Counsel's attorneys have decades of experience litigating FCA actions.  Ronickher Decl. ¶¶ 136 - 177, Table 2.  They are prominent practitioners in the field.  Senior counsel Eric Havian in the past has been recognized as one of the Top 10 Winning attorneys in the nation, California Lawyer of the Year, top 500 lawyers in America, and Whistleblower of the Year in California.  Harry Litman is a former US Attorney for the Western

District of California, Deputy Assistant Attorney General of the United States, and been listed among the Best Lawyers in America in the area of *qui tam* law. *Id.* ¶¶ 146 - 149. Indeed, Eric Havian, the senior partner on the case, and still active today, had previously and very successfully litigated an FCA action against DaVita, with similar claims to those at issue here. Ronickher Decl. ¶ 15.

### 4. Preclusion of Other Employment

The length and intensity of this matter precluded a sizeable portion of the C|C whistleblower practice group from pursuing other matters. Over the eight-year period the core team spent 30,523 of their working hours on the case. *Id.* ¶ 89. This was no small sacrifice for a practice as active and in demand as C|C's whistleblower practice, which receives far more requests for counsel that it can ever accept and files only one to two new whistleblower matters every month. *Id.* ¶ 139. *See Johnson*, 488 F.2d at 718 ("This guideline involves . . . consideration of . . . the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." This is acutely true on a matter like this where C|C's staff prosecuted this matter for over eight years and dedicated tens of thousands of hours of its attorney's time to shepherd it to its resolution. Over the course of their time on the matter, 8 of Counsel's attorneys dedicated more than 10% of their time to the case, and for 4 of them over 25%, precluding them from other work. *Id.* ¶ 107, Table 4. These percentages were not only for the percentage of time which they spent on other billable work, but also inclusive of any time spent on administrative matters, training, marketing, and other tasks. *Id.* As a percentage of their time which they spend only working on this and other matters, it is even higher.

5.      *Contingent Nature of Fee*

The lost opportunity cost this case presented was compounded by the contingent nature of the representation.  Counsel undertook the representation of the Relator contingent on a successful outcome.  Counsel spent thousands of hours of attorney time and $523,534.78 in hard costs and expenses with no guarantee it would be paid for this work or reimbursed for these costs.  *Id.* ¶¶ 112, 115, Table 5, Table 7.  In amending the FCA to include the mandatory fee-shifting provision, Congress specifically recognized the premium this kind of contingency work deserves compared to work where payment is guaranteed:

> It is important, however, to draw a distinction between marketplace rates on a contingency case, such as a case filed under the False Claims Act, and marketplace rates paid by a client to an attorney where payment will be made . . . irrespective of the outcome of the matter. In those instances where attorneys' fees are paid on a monthly basis and not subject to any contingency, those market rates will be substantially below the marketplace rate which depend upon success for any payment and where payment does not come until after the case is concluded and all appeals are ended which can take years.

132 Cong. Rec. H9382-03 (daily ed. Oct. 7, 1986) (emphasis added).

Courts have consistently found that the type of fee arrangement where counsel runs a significant risk of nonpayment ways in favor of the reasonableness of a requested fee award.  *See Faulkner,* 2020 WL 550592 at *5.

6.      *Quality of Results Obtained*

The matter resolved with a substantial, $34 million settlement.  Ronickher Decl. ¶ 86.  At the announcement of the settlement, it was lauded by the DOJ as reflective of, "the seriousness of the government's determination to restore integrity to the healthcare marketplace."[21]  It is not just the size of the financial recovery that makes the Settlement so notable.  It is also an exemplar

---

[21] Statement of Matthew Kirsch, *supra.*

deterrent for entities considering engaging in similar behavior in the future.  As pronounced by the National Law Review, it, "serves as a critical reminder for healthcare professionals and organizations about the importance of compliance with the False Claims Act and the Anti-Kickback Statute."[22]

### 7.    *Awards in Similar Cases*

The $14,537,246.00 lodestar here is especially reasonable when compared to the fee awards in similarly complex, challenging and lengthy litigations.  Earlier this year, the state of Illinois settled a whistleblower action brought under the Illinois False Claims Act, brought by one of Counsel's clients, which resulted in $48 million flowing to the state and $22 million flowing to Counsel and its co-counsel for its fees and expenses in bringing the action.[23]  Last year, the US government settled a FCA case with KBR, brought by Counsel's client, which resulted in $108 million in restitution for the public and $34.95 million to Counsel and its co-counsel as attorney's fees.[24]  In 2020, the state of California settled a whistleblower action brought by C|C and its co-counsel. [25]  The action was brought against the four major wireless companies, alleging overcharges to California public entities.[26]  The settlements with the four carriers totaled approximately $125 million.[27]  At the time, this was a record recovery for the public, the second-largest non-healthcare related settlement in the history of the California False Claims Act.[28]  For that action C|C and its co-counsel were compensated over $35 million in its

---

[22] *See supra* and https://natlawreview.com/article/dialysis-and-deceptiveness-whistleblower-earns-637-million-reporting-unlawful
[23] https://www.prnewswire.com/news-releases/whistleblower-secures-70mm-settlement-for-alleged-municipal-bond-fraud-and-price-fixing-302095982.html
[24] https://www.kbr.com/en/insights-news/press-release/kbr-successfully-settles-legacy-legal-matter
[25] https://www.latimes.com/business/story/2020-09-25/verizon-at-t-to-pay-116-million-to-settle-california-whistleblower-lawsuit
[26] *Id.*
[27] *Id.*
[28] *Id.*

reasonable attorneys' fees.[29]  All three of these matters settled before trial and were the results of years of inquiry.  It is Counsel's practice to litigate lengthy and complicated whistleblower matters, assisting in the recouping of substantial sums for the public, and, when successful, Counsel is routinely compensated accordingly.

Similar cases are few.  The Illinois action resulted in the largest publicly disclosed recovery in the history of the Illinois False Claims Act.  Ronickher Decl. ¶ 140.  The recovery received by Relator in the KBR matter was one of the ten largest recoveries by a Relator in 2023.  *Id.* ¶ 141.  *Barbetta*, previously won by Counsel, was the largest settlement in the nation, ever, for an action within the healthcare industry and covered exclusively allegations of kickbacks.[30]  It is difficult to analogize cases like these to other, more common areas of litigation or even smaller, less consequential actions within the area of FCA litigation.[31]

### 8. *The Undesirability of the Case*

Given the length of time, hours expended, complexity of the case, expertise required, hard costs committed, resources available to the defendants, sophistication of opposing counsel, with no guarantee of ever getting compensated for any of it, this was not a desirable case for many attorneys to accept.

---

[29] *Id.*

[30] https://www.prnewswire.com/news-releases/whistleblower-behind-davitas-record-400-million-settlement-of-charges-alleging-kickbacks-to-doctors-697500515.html

[31] It may be noted, however, that were this a complex class action, which have common attributes with these types of FCA actions as to their requisite sophistication, duration, and contingency of payment, Relator's fee would fall within this Circuit's guidelines of proportionality.  If Counsel's fees and expense and the recovery here were aggregated to a common fund, the common fund would total $49,123,877.81.  Counsel's share of that would be 29.8%, which would be within the customary one-third for contingency fees awarded by courts within this district.  *Faulkner* 2020 WL 550592 at *4.

### C.     The Attorneys' Fees Incurred By DaVita Support the Reasonableness of Relator's Attorneys' Fees

A useful metric to assess the reasonableness of Relator's attorneys' fees in this case should be the attorneys' fees DaVita incurred.  The Eleventh Circuit has recognized that courts may consider the billing of the opposing counsel in determining the reasonableness of a fee.  *See, e.g., In re Home Depot Inc.*, 931 F.3d 1065, 1089 n.22 (11th Cir. 2019) ("Where a party challenges the reasonableness of fees sought by an adversary, a useful source of relevant information in the form of a reference point may be the fees incurred by the objecting party.) *(quoting* David F. Herr, Ann. Manual for Complex Litigation § 14:13 (4th ed. 2018)).  Here, DaVita hired Sidley Austin and Hogan Lovells. This complex litigation merits paying higher-than-local rates, particularly as Counsel's rates are much lower than those of DaVita's own attorneys.  Ronickher Decl., Table 1.

## III.     RELATOR IS ENTITLED TO HIS REQUESTED COSTS AND EXPESNES

As supported by the accompanying billing records, Counsel incurred $523,534.78 in costs and expenses in this case.  Ronickher Decl., Ex. 3.  For many of the same reasons justifying the amount of Relator's attorneys' fees—most importantly, the difficulty of the case and the quality of the result—these costs and expenses are reasonable.  The bulk of this amount ($264,327.46) comes from the retention of PYA whose expertise was required in performing the valuations of the considerations which flowed from DaVita to the other involved parties.

The rest of the costs and expenses Relator incurred were largely for travel, computerized research, filter counsel, court reporting, and data hosting, all reasonable and customary costs for a litigation of this size and scope.

## IV.     RELATOR IS ENTITLED TO HIS FEES IN MAKING THIS MOTION

Relator is also entitled to the fees he has incurred in having to make this motion.  These kinds of "fees-on-fees" awards are routinely made to reimburse prevailing parties in mandatory fee-shifting cases who are forced to litigate over the fees to which they are entitled by statute.[32] Relator will provide with his reply brief the final amount of fees he has incurred and for which he seeks reimbursement in making this motion

## <u>CONCLUSION</u>

For the reasons set forth herein and in the accompanying declaration, Related respectfully requests that the Court order DaVita to pay Relator (i) $14,112,953.03 in attorneys' fees; (ii) $523,534.78 in costs and expenses; and (iii) the fees Relator incurred in making this motion in an amount to be identified in Relator's reply brief.

Dated: September 30, 2024                          Respectfully Submitted,


                                                                        _/s/ Matthew A. Moore_
                                                                        Matthew A. Moore
                                                                        CONSTANTINCANNON LLP
                                                                        6 E. 43rd St. Fl. 26
                                                                        New York, NY  100017
                                                                        Tel: (212) 350-270
                                                                        Email: mmoore@constantinecannon.com

---

[32] *See Shaw*, 213 F.3d at 545 (concluding that the FCA attorney fee provisions "allow the award of attorney's fees for time spent in post-judgment collection activities").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th of September 2024, I electronically filed the foregoing

**MEMORANDUM OF LAW IN SUPPORT OF RELATOR'S MOTION FOR**

**ATTORNEYS' FEES, COSTS, AND EXPENSES** using the CM/ECF system, which served a

notice of electronic filing on all counsel of record and served by email to the following counsel

for defendants:

> Jaime L.M. Jones
> SIDLEY AUSTIN LLP
> One South Dearborn
> Chicago, IL 60603
> Phone: (312)853-0751
> Email: jaime.jones@sidley.com
>
> Michael Theis
> HOGAN LOVELLS
> 1601 Wewatta Street, #900
> Denver, CO 80202
> Phone: (303) 899-7300
> Email: michael.theis@hoganlovells.com
>
> *Counsel for Defendants*

*/s/Matthew A. Moore*
Matthew A. Moore
